266 P.2d 739

**SOLANA LAND CO.**

**v.**

**NATIONAL REALTY CO.**

**KIVEL et al.   v.   SOLANA LAND CO. et al.**

**No. 5729.**

Supreme Court of Arizona.

Feb. 8, 1954.

John M. Schwartz, Tucson, for Solana Land Co.

Knapp, Boyle, Bilby & Thompson, Tucson, for National Realty Co.

Conner & Jones, Tucson, for Simon Kivel and wife, and Joseph K. Kivel, and wife.

UDALL, Justice.

This is an appeal from a single judgment entered in two separate actions that were consolidated for trial in the court below. In accordance with our practice, as between appellant Solana Land Company (hereinafter called Solana) and appellee National Realty Company (hereinafter called National), the facts are stated in the light most favorable to National, and as between appellants Joseph Kivel, et ux. and Simon Kivel, et ux. (hereinafter called Kivels), and appellee Solana, the facts are stated in the light most favorable to Solana.

Solana owned Section 19, T. 14 S., R. 15 E., G. & S. R. B. & M. in Pima County, Arizona, hereinafter called Section 19, or the "tract". Roy Drachman, a realty broker hereinafter called Drachman, solicited and obtained a "business property sales listing" from Solana which gave him the "exclusive right to sell" the tract during the sixty days after March 5, 1951 for a price of $140,000. In the dealings that followed, Drachman submitted the various offers from all prospective purchasers to Solana's president, Mrs. A. R. Schwerin, who was in California.

F. Fred Roberts and William A. Mitchell, hereinafter called Roberts and Mitchell, made several offers to buy the tract or parts thereof. On April 18th they offered $140,000 payable in six months with interest after two months. To this Solana promptly replied by telegram: "Your offer not acceptable; must have all cash." The next day the same parties offered $140,000 payable in sixty days. Drachman, by telephone, submitted this offer to Solana's president on the afternoon of Friday, April 20, 1951. Mrs. Schwerin refused the offer because it did not call for a prompt closing. At this same time Kivels had a pending offer of $130,000 reduced to writing on

a broker's business form used by Drachman, and during this same conversation this offer was refused. A pending offer from National was likewise refused because it did not call for $140,000 cash on prompt closing. Drachman called Roberts and Mitchell, Kivels, and National, informing all of them that the first offer, if any, of $140,000 cash on prompt closing would be accepted.

About 9:30 or 10 o'clock that same evening (April 20th) Kivels decided to raise their offer to $140,000 and Simon Kivel informed Drachman of this by telephone. Drachman changed the amounts on the business form from $130,000 to $140,000, then telephoned Solana and informed it of the new offer. Mrs. Schwerin voiced acceptance, saying the same would be confirmed by telegram. Drachman met with Kivels and they initialed the changes made on the business form. Kivels gave Drachman two checks for $7,000 each as earnest money. A night letter was sent that night by Solana to Drachman, reading:

"Your offer of one hundred forty thousand dollars cash for Section 19 accepted for prompt closing. Confer with Richard Chambers on preliminary agreement and deed."

Chambers, who was secretary of the Solana corporation and its Tucson attorney, also received a night letter informing him of the sale.

About 7 a. m. Saturday morning (April 21st), Simon Kivel telephoned Drachman and informed him that Kivels would be unable to go through with the deal because their brother Tom Kivel in California had died during the night, and this event would upset their financial plans. Simon Kivel asked that the property be sold to some other persons. Drachman then telephoned Edward Smotkin, president of National, and informed him Section 19 was still for sale. At 9:30 a. m. the same day, Smotkin appeared at Drachman's office, signed an offer of $140,000 and deposited $14,000 earnest money. This written offer was submitted to attorney Richard Chambers late the following Monday but was never signed or accepted by the officers of Solana.

On the morning of Sunday, April 22nd, Joe Kivel telephoned from California and spoke to Drachman, stating the Kivels were willing to go through with the business deal and purchase the tract. Drachman expressed his regrets, stating he had sold the tract to National.

Kivels' written offer of $140,000, dated April 20th, had in the meantime been transmitted to Mrs. Schwerin who upon reading it found it unacceptable and sent it to attorney Chambers with a letter to this effect. On Wednesday, April 25, the written offer, unsigned, was returned by Chambers to Drachman with an accompanying letter stating the written offer was not in accordance with the telephone conversation wherein Solana understood payment of $140,000 cash would be made

immediately upon receipt of title papers (the written offer provided for cash payment fifteen days after receipt of title papers). The letter further stated Solana did not agree to the provisions for payment of Drachman's fee in event of buyer's default.

On Thursday, April 26, Roberts and Mitchell filed their complaint in cause 35781, naming Solana as defendant and asking specific performance of an alleged contract to sell Section 19. On Friday or Saturday of that week, Drachman entered into an agreement with National whereby Drachman, purportedly acting as the duly-empowered agent of Solana, sold Section 19 to National. Drachman relied upon his "business property sales listing" as conferring authority upon him to accept National's offer to purchase and thus form a contract binding upon Solana. On May 5, National intervened in cause 35781, alleging Roberts and Mitchell had no contract to purchase the tract, alleging that National had purchased the tract from Solana, asking specific performance of that contract, and asking that National's title be quieted.

Kivels knew of this action and its developments from and after April 30th. However, they made no demand upon Solana for performance of any contract, nor did they tender the purchase price. On July 6th Solana filed its complaint in cause 36151, naming Kivels as defendants, alleging they claimed some right in the tract, and asking that plaintiff's title thereto be quieted. Kivels' answer and counterclaim was filed July 26th, alleging Solana had agreed on April 20th to sell the tract to Kivels and praying specific performance of the contract. The causes were consolidated for trial. At the trial no findings of fact were requested—nor made—though findings would have proved of great value in determining this appeal.

All parties joined in a motion that one judgment be rendered, settling the rights of all parties in both causes. Accordingly, on June 3, 1952, judgment was rendered, adjudging in cause 35781 (1), that Roberts and Mitchell take nothing; (2) that National pay $140,000 to Solana and receive a deed to Section 19; (3) that Solana take nothing by its counterclaim against National to quiet title. In cause 36151 it was adjudged (1), that Kivels had no right, title, or interest in or to Section 19; (2) that Solana was the lawful owner of the tract; (3) that Kivels were entitled to no relief against Solana on their counterclaim for specific performance; (4), that Solana should recover costs from Kivels. From this judgment Solana appeals against National, and Kivels appeal against both Solana and National. Roberts and Mitchell did not appeal, hence the judgment is final as to them.

By appropriate assignments of error the parties have raised the issues hereinafter stated.

22

Kivels' interest.

Kivels contend the judgment is not one against them and that there is no presumption the lower court found the facts to be against them. They claim the lower court found that Kivels bought from Solana, then National bought from Kivels, and to save the circuitous procedure of transferring title first to Kivels and then to National, the court ruled in an expedient manner and transferred it from Solana directly to National. This theory is untenable. It flies squarely in the teeth of the pleadings, the evidence adduced at trial, and the judgment rendered. To establish its claim to Section 19, National relies upon a contract made by it with Drachman on behalf of Solana, and there is not a shred of evidence tending to support any finding of a contract between National and Kivels. The argument that National's contract with Drachman was in substance, fact and intent one with Kivels wherein National derived from Kivels all the rights Kivels had derived from Solana is an hypothesis unsupported by the record. All of the evidence shows National intended to deal directly with Solana, and Drachman represented himself as agent of Solana, not as agent of Kivels. Examination of the judgment rendered can lead but to the conclusion the lower court found against Kivels, and for this reason the facts must be taken in the light most strongly against them.

Even assuming the telegram sent by Solana's president the night of April 20th formed a contract with Kivels, still it is apparent there was a mutual recision thereof. Undoubtedly Kivels, on the morning of Saturday, April 21, 1951, repudiated the contract. It is claimed Simon Kivel had no authority to speak for Joe Kivel but we hold the evidence will permit a contrary conclusion to be reached: Simon and Joe were brothers, Simon had been spokesman for the brothers in the previous dealings leading up to the consummation of the contract with Solana, and Joe was with Simon in the latter's home from the time the Solana contract was concluded up to and including the time Simon made the repudiation. Simon purported to speak for Joe in the matter which involved a gross amount of $140,000, Drachman immediately began looking for another purchaser, showing the interpretation he placed upon the conversation, and his conduct thereafter is mute testimony showing he regarded the situation as one where Kivels would be unable to perform and wanted some other party to buy Section 19 from Solana and treat Kivels as being out of the picture and relieved of their obligations.

It is claimed that even though Simon Kivel offered to rescind, nevertheless that offer was rejected by Joe Kivel's conversation from Los Angeles with Drachman Sunday morning. The evidence

permits the conclusion that Drachman did not so interpret or understand the message and declared the attempt to get back into the game came too late. On the Wednesday following, Solana repudiated Kivels' offer and maintained no contract had been formed. Thereafter, Kivels made no tender of the purchase price to Solana nor demands upon it to convey, and Solana made no tender to Kivels nor demand upon them. Kivels were fully aware of the litigation initiated by Roberts and Mitchell. Kivels' purported contract provided for furnishing title insurance; since no time was specified, the law presumes the parties intended this to be done in a reasonable time, and payment of the purchase price was to be made 15 days after Kivels received such insurance. Surely this period had elapsed during the 77 days from the time of making the alleged contract and the time Solana filed suit to quiet title. All of the evidence shows Solana's insistence upon immediate cash payment and prompt closing of the transaction, emphasizing and re-emphasizing that time was of the essence of the transaction, and with knowledge of all this, time for performance passed and neither made demand upon the other. By its judgment the trial court must have concluded that by their words *and their conduct* the parties offered to rescind, acceptance was made, the contract to rescind was formed, each relieved the other from his obligations, the contract was fully executed, and the affair was ended. In this it did not err.

Kivels contend Solana's telegram of acceptance completed a contract of purchase that was specifically enforceable and thus subject to equitable jurisdiction and application of equity's principles of equitable conversion, and that by operation of law the equitable title to Section 19 vested in Kivels. They contend that, once vested, this equitable estate could not be divested save by an instrument in writing, relying upon Section 71–401, A.C.A.1939:

"No estate of inheritance or freehold or for a term of more than one (1) year, in lands or tenements, shall be conveyed from one to another unless the conveyance be declared by an instrument in writing, subscribed and delivered by the party disposing of the same, or by his agent thereunto authorized by writing."

Our first problem is whether a parol agreement to rescind a written contract for the sale of real property is a "conveyance" within the meaning of the statute of frauds applying to deeds and conveyances, supra.

This provision first appeared in Title XI, Conveyances, sections 214–228, Revised Statutes 1887, and practically a rescript thereof is now found in Chapter 71, Article 4, sections 71–401 to 71–430, A.C.A. 1939. It is error to read the single provision out of its context, as Kivels ask us to

do. Examination of the chapters as a whole shows the legislature intended the statute to apply only to instruments or agreements intended by the parties to operate immediately and be presently effective as instruments of conveyance of estates in real property. The chapters do not deal with contracts to convey in the future, and we hold they were not intended by the legislature to apply to such contracts. The statute therefore has no application, and we accordingly hold parol recision of a contract to make a future conveyance of real property is not forbidden by section 71-401, supra

■ Kivels also contend the statute of frauds pertaining to contracts for the sale of real property, section 58–101, A.C.A. 1939, forbids parol recision of a written contract for the sale of realty:

"No action shall be brought in any court in the following cases, unless the promise or agreement upon which such action shall be brought, or some memorandum thereof, shall be in writing and signed by the parties to be charged therewith, or by some person by him thereunto lawfully authorized:

\*    \*    \*    \*    \*    \*

"6. Upon an agreement for the leasing for a longer period than one (1) year, or for the sale of real property, or of an interest therein;· \* \* \*."

The Restatement of the Law, Contracts, sections 178, 193, 222, and 407, is authority to the effect that where there is an executory written contract to sell an interest in real property, a parol contract of recision thereof is unenforceable, and the written contract is enforceable. To the same effect see Thompson on Real Property, Perm. Ed., Vol. 8, section 4589. There is authority contra cited in Thompson, supra, and in Warvelle on Vendors, Vol. II, section 826. A leading case in point is Strickland v. Wood Bros. Industrial Corp., 141 Kan. 114, 40 P.2d 367, following Ely v. Jones, 101 Kan. 572, 168 P. 1102. But, the Restatement and the cases agree that when the contract of recision has been fully executed, as it was in the case at bar, the question of the statute of frauds and unenforceability of the contract is moot and what has been done will not be undone. See Restatement of the Law, Contracts, section 219; Kilbourn v. Marshall, 24 Ariz. 63, 206 P. 785; Sullivan v. Townsend, 30 Ariz. 63, 243 P. 913.

### National's interest.

To sustain its claim to ownership of the tract, National must rely upon the contract entered into by it with Drachman as agent of Solana. Drachman's authority proceeds from the sales listing agreement, the pertinent parts of which are here set out:

On the face of this regular business form used by realty brokers in Pima County, is the legal description of Section 19, and the price asked. On the back thereof is the standard listing agreement used in that area:

"Tucson, Arizona, March 5, 1951

"Gentlemen:

"In consideration of your agreement to list in your office, and of your efforts to find a purchaser for the same, you are hereby authorized to sell (and are given the exclusive right to sell) at any time within *60* days from the above date, the real estate described on the reverse side of this sheet for *One Hundred Forty Thousand ($140,000)* Dollars and according to the terms therein set forth.

"I agree to pay you for services rendered in effecting a sale, a commission of (5%) per cent, based on the sale price. * * *

"Upon sale or exchange being made, I agree to furnish deed covering merchantable title, also to supply abstract of title to date, or title insurance policy, to buyer and to pay for revenue stamps, recording fees and drawing such papers as may be necessary to close sale, and also pay my pro-rata share of the current year's taxes, interest on mortgages and assessments, water rents and any similar charges against the real estate."

The agreement is signed by the officers of Solana. Solana contends Drachman's authority is limited to finding a purchaser ready, willing, and able to purchase, and thus earning his fee. National contends the authority extended to accepting offers to purchase and forming contracts to sell binding upon the principal.

In Rosenzweig v. Akers, 30 Ariz. 134, 245 P. 278, 280, we said:

"The books are full of cases in which the power and authority of real estate agents are discussed, but they differ so much in their facts that we will not undertake to give any of them individual attention. We have been cited cases by both sides as supporting their respective views. The courts have adopted some general rules that run through and are common to all the cases. One of such rules is that, when the owner of real property lists it with an agent for sale, the agent's authority is generally limited to finding a buyer on the terms and conditions stated by the owner, who may or may not close the deal, as he wishes. Halsey v. Monteiro, 92 Va. 581, 24 S.E. 258. * * *"

In Landskroener v. Henning, 221 Mich. 558, 191 N.W. 943, 945, the court made an extensive review of the authorities and said:

"The authorities cited by counsel for defendant Mrs. Henning in the main unequivocally hold that while the authority 'to sell' found in brokerage contracts authorizes the broker to find and produce a purchaser ready, willing, and able to buy on the terms specified, that

on doing so he has performed his contract and earned his commission, it does not authorize him to enter into a binding contract for his principal, that such authority must be specifically conferred. Language found in many different contracts is held not to grant such authority. An examination of the authorities cited is convincing that the correct rule is announced in Ruling Case Law (4 R.C.L. 262) as follows:

" 'The most serious disagreement in the decisions arises over the question as to whether or not such a broker may enter into a binding contract of sale in behalf of his principal where he is not in express terms authorized to do so. Since it is generally conceded that his only duty is to find a purchaser who is ready, willing, and able to purchase upon the terms specified, the overwhelming weight of authority is to the effect that a broker has no right to conclude and execute a binding contract unless such power is expressly conferred by the use of unequivocal expressions to that effect; that the employment of a real estate broker, as such, or the mere listing of property with him, or the direct instruction to find a purchaser, or any communication from the owner to the broker with respect to the sale of land, will be regarded as giving the agent only the authority to find a purchaser; and that no

wider power than that is necessarily indicated by the words "to sell" or "to make a sale," it being a matter of common understanding that even though one uses such terms in soliciting the services of a real estate broker, nevertheless he reserves to himself the power to conclude the sale, unless there is an express provision to the contrary.'

"A valuable note will be found in 17 L.R.A., N.S., 210. The editorial writer there says:

" 'A careful reading of the cases seems to warrant the statement that the question whether a real estate broker has authority to make a binding contract of sale is generally one of intention, and that the real controversy is not whether the actual grant of authority to sell gives the agent power to execute a contract of sale, but, rather, what form of expression will be deemed to establish an agency to sell, using the term in its broader sense?' The inquiry to be determined, then, in each doubtful case, is whether the owner has shown an intention that his agent shall merely find a purchaser, or that he shall go further and actually effect a binding contract of sale. Since it is generally conceded that the only duty of a real estate broker is to find a purchaser who is ready, willing, and able to purchase upon the terms specified, the overwhelming weight of authority

is that the latter intention is not inferred, except from the use of unequivocal expressions to that effect; and that the employment of a real estate broker, as such, or the mere listing of property with him, or the direct instruction to find a purchaser, or any communication from the owner to the broker with respect to the sale of land, will be regarded as giving the agent only the authority to find a purchaser; and that no wider power than that is necessarily indicated by the words "to sell", or "to make a sale." * * *"

█ We believe the reasoning of the Michigan court is sound and we hold that the sales listing agreement herein set forth, *properly construed does not confer upon Drachman the power to conclude an agreement for the sale of the property that would be binding upon the owner.* The sales listing is nothing more than the employment of an agent to produce a purchaser, ready, willing, and able to buy the property upon the owner's terms. Authorizing a broker to enter into a contract of sale of realty for and on behalf of the owner and in his place and stead is quite a different matter from employing the broker to find a purchaser. Where the broker's duty and obligation to the owner is only to find a purchaser, we should presume the powers conferred to be coextensive with that duty, and delegation of greater powers than those necessary and proper for the performance of the employment would be unusual, and in the absence of explicit declaration thereof such powers do not exist.

It is the decision of this court that the judgment of the lower court must be affirmed insofar as it adjudges appellants Kivel have no rights in the tract, and reversed insofar as it adjudges appellee National is the owner thereof. Appellant Solana is entitled to have its title quieted.

Judgment reversed, with directions to enter judgment quieting Solana's title.

PHELPS, C. J., and STANFORD, LA PRADE and WINDES, JJ., concur.