412 A.2d 236.

ROBERT MACKNIGHT *et al. vs.* ANTOINETTE PANSEY *et al.*

MARCH 14, 1980.

PRESENT: Bevilacqua, C.J., Kelleher, Doris, Weisberger and Murray, JJ.

WEISBERGER, J.    This is a civil action to enjoin the convey-ance of real property from defendant Antoinette Pansey (Mrs. Pansey) to defendant Gordon D. Noonan, and to compel specific performance of an alleged prior agreement by Mrs. Pansey's agent to sell her property to the plaintiffs, Robert B. MacKnight, Jr., and Portia J. MacKnight. The plaintiffs contend that Mrs. Pansey had authorized Lionel J. Carreiro (Carreiro), a real estate agent with whom the property was listed, to sell it on her behalf. From a Superior Court judgment granting the plaintiffs' prayers for relief, the defendants appeal.[1]

Carreiro, the real estate agent, visited Mrs. Pansey on May 21, 1977, after he learned that she was interested in selling her Bristol property. Carreiro and Mrs. Pansey discussed possible price ranges and agreed to list the property at a sale price of $69,500. Mrs. Pansey then signed a standard-form multiple listing agreement, which granted to Carreiro "the exclusive right to sell" the property and guaranteed him a commission regardless of who might procure the sale. The testimony conflicts in regard to whether any of the blanks in the listing-agreement form (other than the sale price) was

---

[1]The notice of appeal was filed after rendition of the decision, but prior to entry of final judgment. Since no issue has been raised concerning the timeliness of the notice, we shall treat the appeal as though it had been taken from the judgment itself. *See Beauvais* v. *Notre Dame Hospital,* 120 R.I. 271, 275, 387 A.2d 689 691 (1978); *Malinou* v. *Kiernan,* 105 R.I. 299, 300, 251 A.2d 530, 531 (1969).

filled in when Mrs. Pansey affixed her signature.

On May 28, Carreiro showed the house to Mr. MacKnight, who offered to buy it for $69,500. Later that day Carreiro and the MacKnights filled out a purchase-and-sale agreement; Mr. and Mrs. MacKnight signed the agreement in the spaces reserved for "buyers" and Carreiro signed in both the "realtor" and "salesman" spaces, leaving blank the spaces marked "sellers." Mr. MacKnight gave Carreiro a check for $300 as a deposit. MacKnight understood that Carreiro was going to take the sales agreement to Mrs. Pansey for her signature. MacKnight testified that Carreiro gave him a photograph of the property and said, "I might as well give you this picture. You just bought it. You own it." Carreiro testified he told MacKnight that as soon as Mrs. Pansey signed the sales agreement, "then we would have a sale." Carreiro took the sales agreement and check to Mrs. Pansey, but she refused to sign the agreement until she had consulted her attorney.

The next day Mr. MacKnight and Carreiro met with Mrs. Pansey at her property. MacKnight and Mrs. Pansey "were getting along [with each other] very good," according to Carreiro's testimony; MacKnight stated that they discussed closing dates and financing terms. However, since Mrs. Pansey preferred to contact her attorney first, she did not sign the sales agreement on this occasion either.

On the Fourth-of-July weekend Mr. MacKnight met with Mrs. Pansey who adverted to merely "mechanical" difficulties in connection with the sale to the MacKnights. But, according to MacKnight's testimony, Mrs. Pansey told him she "ha[d] no concern because the house is yours." Thereafter both Mr. and Mrs. MacKnight made several attempts --some successful, some not -- to reach Mrs. Pansey or Carreiro by telephone. On July 25 Mr. MacKnight called Mrs. Pansey, who told him she had sold the property to defendant Gordon D. Noonan. MacKnight's $300 check to Carreiro was never cashed.

Mrs. Pansey testified that the tenor of her agreement with Carreiro was only that he might show the property for sale

--not sell it. She said she merely wanted some idea of what the property was worth; she wanted to keep the property in the family, perhaps through sale to her son. According to her testimony, Mrs. Pansey "positively" told MacKnight she wasn't sure whether she wanted to sell the property, and she never agreed to sell it to the MacKnights. Carreiro testified that in his opinion the property could only have been sold when Mrs. Pansey signed the sales agreement. Carreiro said he told the MacKnights that "there was no agreement" because Mrs. Pansey had not signed the sales agreement. Carreiro testified that his duty was to report offers to the seller; "it's up to them to accept it or reject it."

Sitting without a jury, the trial court heard the evidence and ruled that Mrs. Pansey, by signing the multiple listing agreement with Carreiro, had made him her agent to contract for the sale of the property. The trial court ruled that Carreiro had in fact entered into such a contract with the MacKnights. The court further found that the multiple listing agreement was "an adequate writing signed by the party to be charged" to satisfy the statute of frauds. The court enjoined the conveyance of the property to defendant Gordon D. Noonan and ordered that it be conveyed to the MacKnights.

The defendants in their appeal assert that Carreiro had no authority to sell the property on behalf of Mrs. Pansey. According to defendants, the multiple listing agreement did not create such an agency relationship as to enable Carreiro to bind Mrs. Pansey to a contract of sale; nor did Mrs. Pansey by any other action confer such authority on Carreiro, nor did Mrs. Pansey ratify any attempt by Carreiro to contract for the sale of her property. The defendants also challenge the ruling that the listing agreement satisfies the statute of frauds.

We first consider whether Carreiro had the authority to bind Mrs. Pansey to a sales agreement. The trial court found "as a fact that the document Mrs. Pansey executed for Mr. Carreiro at her home was an exclusive right to sell the real

estate which she gave to Mr. Carreiro knowingly," and that "she failed to revoke the power, the exclusive right to sell which she gave to Mr. Carreiro before he had, in fact, sold it." This ruling necessarily embodies a conclusion of law that the listing agreement could be itself confer upon Carreiro the power to contract to convey the property.

We believe that this legal conclusion was not consonant with established case law in this and other jurisdictions. As we have previously ruled, an exclusive-agency listing agreement does not, by itself, give the real estate agent the power to bind his principal to a contract of sale. *Winiarski* v. *Leon Meyer, Inc.*, 82 R.I. 125, 130, 106 A.2d 503, 505-06 (1954). The owner of real property who lists it with an agent generally retains the right to decide whether to accept the offers which the agent brings him. Carreiro, by bringing the sales agreement to Mrs. Pansey for her approval and signature, performed his responsibilities in full accord with the accepted practice of the real estate business and did not attempt to exceed an agent's typical function of finding ready, willing, and financially able buyers to present to the seller.

In an effort to distinguish *Winiarski*, the MacKnights correctly point out that that case dealt with an "exclusive-agency" contract, not an "exclusive power of sale," as is present here. The former type of agreement prevents the principal from employing another real estate agent but permits the principal to avoid the obligation to pay a broker's commission when he sells the property himself. The exclusive power of sale, on the other hand, obligates the principal to pay the agent his commission even when the principal himself finds the purchaser and consummates the sale. *Zifcak* v. *Monroe*, 105 R.I. 155, 157 n.3, 249 A.2d 893, 895 n.3 (1969); *Donahue* v. *Reiner Co.*, 46 R.I. 302, 304-05, 127 A. 359, 360-61 (1925).

The distinction between these two types of agreements, however, has no bearing upon the question whether a real estate agent can bind the principal to a sales contract. It is

well established that an agent with an exclusive power of sale, like one with an exclusive agency, has no implied authority to bind his principal by entering into a contract for sale of the realty, despite the presence in the listing agreement of such terms as "exclusive right to sell" or "sole and exclusive power to sell." *Bernstein* v. *Yee Wong,* 236 F. Supp. 5, 6 (D.D.C. 1964) (exclusive right to sell); *Solana Land Co.* v. *National Realty Co.,* 77 Ariz. 18, 25-27, 266 P.2d 739, 744-45 (1954) (authorization to sell and exclusive right to sell); *Preisendorf* v. *Jenkins,* 193 Neb. 611, 614, 228 N.W.2d 591, 593 (1975) (exclusive right to sell); *Gilmour* v. *Simon,* 37 Can. S. Ct. 422, 425 (1906) (exclusive right of sale); Walker, *American Law of Real Estate Agency* 34 (2d ed. 1922); Annot., 43 A.L.R.2d 1014, §7[c] at 1022-23 (1955). Therefore, the factual distinction asserted by the MacKnights between the listing agreement in *Winiarski* and the present case is without legal significance. Various courts from other jurisdictions which have interpreted exclusive-power-of-sale agreements have followed the meaning given to these standard forms by the real estate business. *Compare* Annot., *supra, with* North & Ring, *Real Estate: Principles and Practices* 237 (5th ed. 1960). This doctrine also is consistent with the expectations of property owners who most frequently retain agents to find them willing buyers, not to make final and binding decisions on whether, on what terms, and to whom to convey.[2] *See generally* Annot., *supra.*

The rule we announced in *Winiarski* and reiterate here does not, of course, mean that a principal cannot confer upon his agent the additional authority to bind him to a sales contract. A specially worded agency contract delineating the agent's authority in clear, express, and unequivocal terms may accomplish this result. Words or conduct apart from the listing agreement may do so as well. Such a case was *Cuddigan* v. *List,* 93 R.I. 505, 177 A.2d 195 (1962), in which

---

[2]It should be noted in this case that the contract submitted to Mrs. Pansey provided for only a $300 deposit and was subject to the plaintiffs' obtaining a $50,000 mortgage. These are terms that sellers might not automatically find to be acceptable.

an agent with a "sole and exclusive right to sell" telephoned his princiapl to convey a purchase offer that was below the listed price. The principal said he would accept the offer, whereupon the agent drew up a receipt and accepted a check from the purchaser, who signed a contract of sale. We held that there was sufficient evidence to warrant a finding that the principal, by agreeing to accept the lesser amount, had "authorized [the agent] to enter into an agreement to sell the property and to sign whatever was required to render such agreement valid and binding." *Id.* at 509, 177 A.2d at 197-98. Thus, in *Cuddigan*, the telephone conversation, and not the listing agreement, created the agent's power to bind the principal to a sales contract. Nothing in *Cuddigan* may be read as suggesting that the listing agreement without the telephone conversation would have been sufficient to create such a power.

As a further argument the MacKnights, both in brief and at oral argument, strenuously attempt to bring the facts of this case within the rule of *Cuddigan* by adverting to evidence that, they argue, is tantamount to the critical telephone call in *Cuddigan*. The trial court did not pass directly on this contention, nor on the MacKnights' contention that, if one assumes Carreiro's original actions were unauthorized, Mrs. Pansey ratified the sales agreement. Our examination of the record shows us no evidence to suggest that Carreiro ever purported to possess or exercise a power to enter into a contract of sale on behalf of Mrs. Pansey. The MacKnights, it is true, can point to testimony of a continuing course of verbal assurance by Mrs. Pansey and Carreiro that may well have led them to believe that a contract would ultimately be executed. Such evidence does not, however, tend to prove that Mrs. Pansey empowered Carreiro to form the contract.

Moreover, there is in the record no written sales contract signed by Mrs. Pansey or "some other person by [her] thereunto lawfully authorized," sufficient to satisfy the statute of frauds, G.L. 1956 (1969 Reenactment) §9-1-4.[3] Clearly the

---

[3]General Laws 1956 (1969 Reenactment) §9-1-4 states in part:

"No action shall be brought * * * [w]hereby to charge any person upon any

listing agreement -- the only document in this case signed by Mrs. Pansey -- does not meet the established criteria for memoranda of sales of land. Such memoranda must set out who are the seller and the buyer, their respective intention to sell and to purchase, a description of the subject matter of the sale, the purchase price, and terms of payment. *Durepo* v. *May*, 73 R.I. 71, 76, 54 A.2d 15, 18-19 (1947); *Sholovitz* v. *Noorigian*, 42 R.I. 282, 285-86, 107 A. 94, 95 (1919). A listing agreement does not name the eventual buyers of the property or express their intention to buy; for that reason it is elementary that listing agreements do not set forth the terms that will later be included in sales contracts to which the listing agreements may eventually lead. *Lusky* v. *Keiser*, 128 Tenn. 705, 164 S.W. 777 (1914); *Handlos* v. *Missman*, 7 Wis. 2d 660, 667, 97 N.W.2d 419, 423 (1959).

The MacKnights also argue that the sales agreement they signed satisfies §9-1-4. The sales agreement in this case undoubtedly supplies many of the elements absent from the listing agreement; it sets out the terms of the purported sale, but it is not signed by Mrs. Pansey, the party to be charged.[4] According to the contentions of the MacKnights, Carreiro's signature on the sales agreement suffices to charge Mrs. Pansey upon the contract, since, as they assert, Carreiro was Mrs. Pansey's authorized agent to contract for the sale of her property. Although we find this argument engaging, we have concluded that Carreiro did not by his signing of this agreement purport to be acting in behalf of Mrs. Pansey for purposes of §9-1-4. His signature as "realtor" and "salesman"

---

contract for the sale of lands, tenements or hereditaments * * * [u]nless the promise or agreement upon which such action shall be brought, or some note or memorandum thereof, shall be in writing, and signed by the party to be charged therewith, or by some other person by him thereunto lawfully authorized."

[4]Mrs. Pansey's signature on the listing agreement cannot be imputed to the sales contract. Although in some situations signed and unsigned writings may be read together to satisfy the statute of frauds, the signed writing must refer to the unsigned one in such a fashion as to imply assent to its terms. *Kates Corp.* v. *Kirshenbaum*, 122 R.I. 486, 491-2, 409 A.2d 540, 544 (1979). It is obviously impossible for a listing agreement to refer to a contract of sale that is not yet in existence.

merely evidenced his participation as a sales agent. Carreiro did not sign either his own name or that of his principal on the line marked "seller," nor did he otherwise manifest the intention that his signature should constitute explicit or implicit acceptance on behalf of Mrs. Pansey of the terms of the contract.[5] To the contrary, there is every indication that Carreiro signed the sales contract merely to note that he participated in the transaction as realtor, and thus to safeguard his right to the commission referred to in the agreement. As a result, neither Mrs. Pansey nor her putative authorized agent, acting as such, signed the sales agreement in such manner as to be bound by its terms.

The United States Court of Appeals for the Fifth Circuit considered a nearly identical situation in *Moritt* v. *Fine*, 242 F.2d 128 (5th Cir. 1957). In that case the plaintiff's suit for specific performance was based upon two documents, denominated "Deposit Receipts," but which were actually buy-sell agreement forms as well. As in the case at bar, the sellers had not signed the document; the buyer had; and the alleged agent had signed his own name at a place that was appropriate for a broker's signature. The defendants raised the Florida statute of frauds, and the trial court dismissed the action for failure to state a claim. Under the appropriate standard of review, the court of appeals assumed the agent was authorized to bind the sellers to contracts of sale. The court reasoned that the "Deposit Receipt" forms contained in effect two agreements -- one between the buyer and the sellers, and one between the buyer/depositor and the broker who held the deposit. The signature of the agent, the court ruled, clearly related only to the latter agreement, even though several of the terms of the sales agreement appeared above the agent's signature.

---

[5] In order that the requirements of the statute of frauds be met, satisfactory evidence must show that the signature on a memorandum was affixed with intent to authenticate the memorandum's contents. 2 *Corbin on Contracts* §520 at 762 (1950); Restatement *Contracts* §210 (1932); *cf. Kates Corp.* v. *Kirshenbaum*, 122 R.I. 486, 492, 409 A.2d 540, 544 (1979) (signature on separate writing; no intent to authenticate found).

"[H]owever much authority it is alleged [the agent] had to act for the owners of the land he did not purport to exercise this authority by signing as their agent to sell; his signature merely acknowledges his own receipt of the money and his own consequent obligation." *Id.* at 131.

The court added that "had [the agent] signed the contract so that his signature stood for an acceptance of its terms quite a different question would have been presented to the trial court for decision." *Id.*[6]

Similarly, in a recent case controlled by Rhode Island law, the Court of Appeals for the First Circuit ruled that the signature of duly authorized agents in blanks labeled "Prepared by" and "Recommend" did not manifest any intention on the part of the agents to bind the principal to the terms of the documents; neither did an agent's signature in a blank labeled "Approve" manifest such an intention when the face of the document suggested that four such signatures were required for final approval and only one was entered. *Centredale Investment Co. v. Prudential Insurance Co. of America,* 540 F.2d 16, 18-19 (1st Cir. 1976) (construing §9-1-4).

While we reject Carreiro's signing of the sales agreement as sufficient to charge Mrs. Pansey under §9-1-4, we do not

---

[6]In dissent Circuit Judge Brown argued that dismissal on the pleadings was improper because the buyer should have had the opportunity to introduce evidence tending to show that the agent had intended to authenticate the terms of the sales agreement, even though he apparently signed merely as the recipient of the buyer's money deposit. *Moritt v. Fine,* 242 F.2d 128, 133 (5th Cir. 1957) (Brown, J., dissenting). Judge Brown reasoned that the agent could have satisfied the statute of frauds by signing the document "top, bottom, left or right margin, across the face, or on the reverse side," provided that intent thereby to authenticate the document could be proved. *Id.* at 135. Therefore, he maintained, the presence of the signature in the wrong place was not conclusive. In the present case, unlike *Moritt,* the MacKnights had the opportunity to present evidence that Carreiro, although he signed merely as "realtor" and "salesman" and refrained from signing as "seller," intended to authenticate the sales agreement in his alleged authority as agent-to-contract. The failure to adduce such evidence precludes a finding of intent to authenticate the agreement, thereby rendering Judge Brown's objection to the result in *Moritt* inapplicable to the case at bar.

mean to suggest that an authorized agent who places his signature in an uncharacteristic place on a memorandum will necessarily fail to bind his principal or charge him under §9-1-4. The statute does not require a signature to meet exacting requirements of form. The test of a signature, whether of a party to the agreement or his agent, to satisfy the statute of frauds is whether the signer intends, however implicitly, to vouch for the accuracy of the essential terms of the agreement. *Kates Corp.* v. *Kirshenbaum*, 122 R.I. 486, 492, 409 A.2d 540, 544 (1979). When, as here, it is clear that a signature fails to serve this function, the writing fails to meet the requirements of the statute. In this case Mrs. Pansey may not be charged upon the contract.

As their final argument, the MacKnights assert that the requirement of a writing in this case may be circumvented under the rule enunciated in *Peacock Realty Co.* v. *E. Thomas Crandall Farm, Inc.*, 108 R.I. 593, 278 A.2d 405 (1971), and more fully expounded in *Adams-Riker, Inc.* v. *Nightingale*, 119 R.I. 862, 383 A.2d 1042 (1978). *Peacock Realty* involved a claim for a broker's commission to which claim the defendant interposed the statute of frauds. The defendant's president admitted under oath that he had agreed to pay the broker a 10-percent commission for the sale of the property in issue. We held that these admissions, taken together with a signed writing which contained the other terms of the agreement, rendered the agreement enforceable. In *Adams-Riker*, an employer sued its employee to recover its share of commissions under an alleged oral employment contract not to be performed within one year. Throughout the proceedings the defendant admitted the terms and conditions of his employment agreement. Although there was no signed writing as in *Peacock Realty*, we extended the rule of that case and held that when a party to be charged judicially admits all of the terms of an alleged contract, he will not be permitted to perpetrate an injustice by invoking the lack of a signed memorandum as a defense.

Neither *Peacock Realty* nor *Adams-Riker* stands for the proposition that a defendant who denies that a contract was

ever entered into may be bound by the terms alleged by the plaintiff solely because the defendant makes reference to those terms in open court. Throughout their testimony Carreiro and Mrs. Pansey expressed their conviction that no contract ever emerged from the negotiations with the MacKnights. Carreiro testified repeatedly that there was no contract because Mrs. Pansey never signed the sales agreement; "I couldn't force her to sign it [if I wanted to]." Mrs. Pansey testified that she never consented to sell the property to the MacKnights. Thus Mrs. Pansey and her purported agent did not admit the existence of the contract; and in the absence of such an admission, there is no substitute for complete compliance with the requirements of §9-1-4. *Kates Corp.* v. *Kirshenbaum,* 122 R.I. at 492-93, 409 A.2d at 544; *Peacock Realty Co.* v. *E. Thomas Crandall Farm, Inc.,* 108 R.I. at 602, 278 A.2d at 410.

The defendants' appeal is sustained, the judgment appealed from is vacated, and the case is remanded to the Superior Court for entry of judgment for the defendants.

*Aisenberg & Dworkin, Alan T. Dworkin,* for plaintiffs.

*Tillinghast, Collins & Graham, Edward J. Regan,* for defendants.