Robert M. HOLLAND, et al., Appellants,

v.

William T. HANNAN, et al., Appellees.

No. 82–508.

District of Columbia Court of Appeals.

Argued Aug. 31, 1982.

Decided Jan. 20, 1983.

Ralph N. Albright, Jr., Washington, D.C., with whom Avis E. Black, Washington, D.C., and F. Scott Kellman, Pittsburgh, Pa., were on the brief, for appellants Robert M. Holland and Thomas W. Holland.

Benjamin W. Dulany, Washington, D.C., for appellant Robert D. Weaver.

Terence P. Boyle, Washington, D.C., with whom Michael J. Conlon and Brenda A. Jacobs, Washington, D.C., were on the brief, for appellees.

Before NEBEKER, MACK and BELSON, Associate Judges.

BELSON, Associate Judge:

This is an appeal by Robert M. Holland, Thomas W. Holland, and Robert D. Weaver ("landlords")[1] from an order of the trial court granting the motion of Norbrick Realty Company, William T. Hannan, et al. ("tenants")[2] for summary judgment and denying landlords' cross-motion for summary judgment. See Super.Ct.Civ.R. 56(c). In a comprehensive opinion, the trial court construed Paragraph XVII, the "buy out" provision, of the 99-year ground lease between landlords and tenants. Paragraph XVII provided that once either tenants or landlords "determined to sell" their interest in the leasehold or the land, respectively, they were required to inform the other party of their determination and allow the

---

1. Appellants-landlords Robert M. and Thomas W. Holland were plaintiffs in the trial court. Robert D. Weaver was the third-party defendant. Robert and Thomas Holland were the sons and personal co-representatives of the estate of the late Mary Holland who, together with Robert Weaver, was the original ground lessor.

2. Appellees-tenants were the following individual partners of Norbrick Realty Company, a District of Columbia general partnership: William Hannan, Albert Goldstein, John Dobricky, Bernard Walsh, and Norair Realty Company, a corporation (Richard Norair). This general partnership is the assignee of Norbrick Realty Company, Inc., a District of Columbia corporation, which was the original tenant and which conveyed the leasehold to the present tenant in April 1973.

other party to purchase the sellers' respective interest within sixty days at a market value arrived at by appraisal. In ruling in favor of tenants, the trial court held that, as a matter of law, tenants had not "determined to sell" their leasehold interest until they entered a firm contract of sale on specific terms and conditions with the Vogel-Kaufman-Feldman Joint Venture ("Vogel-Kaufman") on September 17, 1980, and had not done so previously when they agreed to a series of nonexclusive listing agreements for the sale of their interest with various real estate brokers beginning in August 1979. The court held that tenants had complied with the terms of Paragraph XVII when they offered the landlords the opportunity to purchase their interest at its appraised value as of September 17, 1980, and that landlords' refusal to purchase tenants' interest at that appraised value within sixty days terminated landlords' right to purchase tenants' interest under the "buy out" provision.

In contesting the trial court's decision, landlords contend that a firm contract of sale on specific terms and conditions is only one of several ways in which a determination to sell within the meaning of the "buy out" provision can be manifested objectively; that tenants' listing agreements, correspondence, and conduct beginning August 1979, were objective manifestations of tenants' determination to sell their leasehold interest; that the trial court erred as a matter of law when it granted tenants summary judgment in light of the substantial factual issues and disputes concerning the point in time when tenants "determined to sell" their interest; that the trial court improperly resolved genuinely disputed issues of fact and drew "all possible inferences" from the evidence against the landlords, and that the trial court either misconstrued or overlooked relevant case law in arriving at its decision.

We agree with the trial court's definition of "determine to sell" as an "unequivocal decision to transfer rights in property to another for consideration." However, we are not in full agreement with the trial court's conclusion that the exclusive means of objectively manifesting such determination is "either by offering the property to another on specific terms and conditions or by agreement to accept the offer of another to purchase on specific terms and conditions." We observe that express statements, agreements, or other conduct by either tenants or landlords, short of a firm contract with a third party, may also amount to an "unequivocal" manifestation of a determination to sell. Nevertheless, based upon our review of this record, we agree with the trial court that as a matter of law tenants' listing agreements and other conduct did not amount to an "unequivocal" decision to sell their leasehold interest. We conclude that the trial court did not err in granting appellees summary judgment under Super.Ct.Civ.R. 56(c). Accordingly, we affirm.

## I

In light of the nature of appellants' contentions, we set out the undisputed facts in some detail. On December 21, 1959, Mary A.W. Holland and Robert D. Weaver, the owners of certain unimproved real estate at 2215 to 2233 Wisconsin Avenue in Georgetown, entered into a 99-year ground lease agreement with the corporate predecessor in interest of the present tenants, Norbrick Realty Company. This lease was substantially amended by the parties on December 31, 1963. Under Paragraph XVII of the 1963 Amended Lease now in effect, the parties gave each other reciprocal, conditional "buy out" rights.[3] Under that para-

**3.** The text of Paragraph XVII is as follows:

If Lessors, at any time or times during the term hereof, shall determine to dispose of any interest in the leased property by sale, or exchange, (other than as security for a bona fide loan), Lessors shall give Lessee a written notice to that effect and thereupon the fair market value of the interest so to be disposed of shall be appraised in accordance with the provisions of paragraph III above, and upon the receipt of the appraisal, Lessee shall have an option for sixty (60) days within which to

graph, once either landlords or tenants determined to sell their interest in the leasehold or the land, respectively, they were required to notify the other party of that determination. Under Paragraph III of the Amended Lease, the party so notified could then opt to begin the appraisal process by appointing an appraiser and giving notice of that appointment to the party which had "determined to sell," which would, in turn, have twenty days to appoint a second appraiser. The two appraisers would then have twenty days in which to appoint a third appraiser. The three appraisers would then perform an appraisal which would determine the fair market value of the property. Once the appraisal was done, the party beginning the appraisal process would have the right for sixty days to execute a contract at the appraised fair market value and make a deposit of ten percent of the appraisal price. If the party failed to exercise its preemptive right, the selling party had one year to sell its interest free of any obligation to the other party, and at any price.

In 1964, tenants erected a five-story commercial office building, the Georgetown Building, on the unimproved land. On December 22, 1964, tenants, by agreement,

> (a) execute a contract to purchase the interest to be disposed of for cash at the appraised fair market value returned by the appraiser or appraisers and (b) make a deposit of ten per cent (10%) of the appraisal with a title company to be selected by Lessee on account of the purchase price settlement to be within sixty (60) days after such deposit. If Lessee fails to exercise its option or complete its contract to purchase, Lessors thereafter shall be free for a period of one (1) year to dispose of the interest so appraised by sale, exchange, or otherwise at such price and upon such terms and conditions as Lessors may determine, without further submission to Lessee and free of all options of Lessee. Conversely, if Lessee shall determine to sell any of its interests in the leasehold estate created hereby and/or any improvements constructed by it, then the same procedure shall be followed as set out above, with Lessors having the option to buy subject to the same conditions and time limits, and subject to any valid outstanding and recorded encumbrances on said leasehold interest.

formed a joint venture to own and operate the Georgetown Building.[4] Although over the years, the tenant partners, especially Richard Norair, had often mentioned the possibility of selling the Georgetown Building, it was not until 1978 that disputes over the management of the building led tenants to consider seriously the sale of the building.[5]

On July 20, 1979, Norair granted Coldwell Banker & Co., a real estate broker, a nonexclusive listing for the Georgetown Building. The listing agreement stated that tenants "will sell" the Georgetown Building for "6.3 million, all cash to existing first mortgage." Mr. Kyle, the Coldwell Banker agent, notified Norair by mail on August 7, 1979, that he had a quantifying prospect. Upon learning this, William Hannan wrote to both Norair and Kyle on August 13, that Norair had not been authorized by the partners to list the building.

In response, Norair wrote Hannan on the next day stating that Hannan had been absent from a prior partnership meeting "where tenant-partners Goldstein and Dobricky had agreed that a sale in the amount equal to $1 million net for each partner would be acceptable." Norair's letter continued:

4. Under the joint venture agreement, Norair and Hannan were designated "trustees" of the joint venture, the straw parties holding the title to the building on behalf of the other partners. Norair and Dobricky were designated "managing venturers," having the authority to execute all instruments for the use, operation, financing and general management of the property. Each partner had equal rights in the management and conduct of the business of the joint venture, based on his proportionate interest in its income. Management "decisions" were to be made by a majority of the partners (i.e., three) and the building could not be sold without the written consent of a majority of the partners.

5. Also in 1978, landlords and tenants began an appraisal process under Paragraph II(d) of the Amended Lease to determine the decennial increase in ground rent to commence January 1980.

I feel that it is essential that we have a meeting on this matter, which has been scheduled for August 20, 4 p.m., at the Georgetown Building, to determine once and for all the position we are going to take vis-a-vis keeping the Georgetown Building or selling it and at what price.

On the same day, Norair wrote Kyle that:

[T]he partners do desire to sell the Georgetown Building, but until certain offers now pending can be screened and finalized we do not desire to have the Georgetown Building put on the open market at a price less than $7.5 million.

At the meeting on August 20, the partners agreed to list the building with Coldwell Banker and to set their asking price at $6.75 million. On August 21, Norair wrote Kyle the following:

At a recent partnership meeting of Norbrick Realty, it was concluded that the Georgetown Building would be offered for sale at a price of $6,750,000 with a limited sale commission of 2½ percent on the gross amount.

Further, the partnership stated that only serious offers should be brought to them and upon determination of theseriousness of the intent of the offer, detailed information would be made available to the broker for subsequent review by the prospective purchaser.

In a letter of August 22, 1979, Norair granted another nonexclusive listing to broker Michael Zarpas of B.F. Saul Company on the same terms as in the Coldwell Banker listing. In September 1979, William T. Hannan, Jr. of Danac Associates (and the son of appellee Hannan) was also granted a nonexclusive listing. This listing agreement stated that the tenant partnership "desires ... to offer ... the property for sale to a bona fide purchaser." In the remainder of 1979 and the early months of 1980, the tenant partners entered into similar nonexclusive listing agreements with several other real estate brokers.

Tenants received at least three offers to purchase the Georgetown Building from August 1979 to June 1980.[6] They were rejected for various reasons, including failure to meet the partners' criterion of a net $1 million profit for each partner. However, in July 1980, tenants received two contracts for sale which they all considered "realistic" or "reasonable." Vogel-Kaufman offered $6.1 million and Burleith Realty Company offered $6.215 million. Obviously receptive to the Vogel-Kaufman offer, Norair and Goldstein on September 4, 1980 sent a letter to Hannan and Dobricky, threatening to dissolve the partnership if Hannan and Dobricky did not sign Vogel-Kaufman's proposed contract. In relevant part, the letter states:

Over six months ago the four decision making partners of Norbrick Realty agreed that it.was an appropriate time to sell the Georgetown Building. Since that time several offers have been made and all but one ha[ve] been rejected. At present there is a standing offer to purchase the Georgetown Building for $6,100,000 cash. The terms and conditions of the proposed contract are acceptable to all the partners as far as we can determine. However, there remains a problem. Only two partners will sign the agreement. These two partners are Richard Norair and Albert Goldstein. We sincerely wonder what the ulterior motive of the other two partners may be. Is there another offer that is viable that we do not know about? Or have Dobricky and Hannan changed their mind about selling the building? If the latter is the case, then Murph and I, in accordance with the Partnership Agreement, wish to withdraw out [sic] interest in the Norbrick Realty Joint Venture in accordance with Paragraph 14b(ii), Paragraph 14b(v) and Paragraph 14b(vi).

Less than two weeks later, on September 17, 1980, tenants agreed to sell the Georgetown Building to Vogel-Kaufman. The

---

**6.** These offers were from Jerome Golub of Federal Finance & Realty Co. for $5.4 million, Associated Investment Co. for $6.03 million and Rucker Associates for $6.1 million.

contract of sale incorporated by reference the amended lease.

On November 5, approximately seven weeks later, Hannan notified landlords of the sale. On November 13, tenants supplied landlords with the contract of sale. On December 9, landlords notified tenants that they were invoking the appraisal process under Paragraph XVII, that they were withholding consent to the sale until they decided whether to exercise their right to purchase the Georgetown Building, and that they were appointing Anthony Reynolds as their appraiser. On December 23, tenants notified landlords that they were appointing Donald Boucher as their appraiser. The two appraisers then appointed Richard Harps as the third appraiser. Landlord Mary Holland died on January 9, 1981 and her sons, appellees Robert and Thomas Holland, were appointed personal co-representatives of her estate.[7]

On April 27, 1981, counsel for the respective partners met to draft an instruction letter for the appraisers. Without objection by landlords' counsel, the letter included an appraisal date of September 1980. Tenants and landlord Weaver subsequently executed the letter, although landlords Robert and Thomas Holland refused to sign. On July 16, Weaver disavowed his consent to this letter upon learning that tenants had been listing the building for sale since August 1979.

On May 18, having completed the appraisal, the appraisers notified respective counsel for the parties that the Georgetown Building had a fair market value of $6.4 million as of September 1980. Copies of the appraisal were delivered to landlords on May 21. Counsel for tenants also notified landlords that under Paragraph XVII they had sixty days, or until July 20, to execute a contract of sale and deposit 10% of the purchase price. Tenants' closing date with Vogel-Kaufman was July 31.

On July 10, 1981, Robert and Thomas Holland filed suit in Superior Court against tenants for a declaratory judgment and injunctive relief. They sought a declaration that, under Paragraph XVII of the Amended Lease, the appropriate appraisal value be determined as of sixty one days *prior* to the tenant's first listing agreement with Coldwell Banker in August 1979, and not as of the September 17, 1980 date of tenants' contract with Vogel-Kaufman. The Hollands also sought to enjoin tenants' sale of the Georgetown Building to Vogel-Kaufman prior to their requested re-appraisal.

Tenants answered, denying all of landlord's claims. They also filed a counterclaim which alleged that landlords had interfered tortiously with tenants' contract with Vogel-Kaufman, and sought damages and injunctive relief. They impleaded landlord Weaver as a third-party defendant. Tenants also sought a declaratory judgment that they had determined to sell the Georgetown Building only as of September 17, 1980, when they entered into the contract with Vogel-Kaufman, that their November 5, 1980 notice of the sale to Vogel-Kaufman complied with the "buy out" rights of Paragraph XVII, and that landlords' failure to execute a contract for sale at the September 1980 appraisal figure within the sixty days required under Paragraph XVII deprived them of any right to purchase the leasehold.

After discovery, the parties filed cross-motions for summary judgment.[8] In ruling

7. On February 6, 1981, tenant filed an action for declaratory judgment against the landlord in Superior Court requesting that no appraisal process be required under Paragraph XVII on the grounds that neither landlord Weaver nor the estate of Mary Holland had any intention, nor was otherwise willing or able, to exercise the option to purchase and that, subsequently, tenant should be able to proceed with its contract of sale with Vogel-Kaufman. This action was dismissed, with prejudice, May 25, 1982.

8. In ruling on the cross-motions for summary judgment, the court had before it the depositions of appellees Richard Norair and William Hannan, appellants Robert and Thomas Holland, and appellant Weaver's attorney, Benjamin W. Dulany, and the affidavits of appellees Norair, Hannan and Dobricky.

on them, the trial court addressed two issues:

(1) what does the phrase "determine to sell" as used in Paragraph XVII mean? (2) in light of the meaning of "determine to sell" when did the tenant "determine to sell"?

As to the first, the court held that "determine to sell" means

a firm unequivocal decision to transfer rights in property to another for consideration.... [T]his decision to transfer rights to another for consideration can be triggered either by offering the property to another on specific terms and conditions or agreeing to accept the offer of another to purchase on specific terms and conditions.

The court provided four reasons for its construction of the term: (1) the definition affords a plain, common sense interpretation of the lease words which avoids the problems involved in examining the subjective intentions of the parties which would be posed by landlords' suggested definition; (2) the definition is commercially reasonable; (3) it comports with the intent of the rest of Paragraph XVII, and (4) it fulfills the purpose of the conditional "buy out" provision of Paragraph XVII by keeping the trigger of the option in the optionors' hands and protecting them from being forced to sell when they have simply "contemplated" selling, but have not conclusively determined to dispose of their interests.

As to the second issue, the trial court rejected landlords' argument that tenants' nonexclusive listing agreements and other conduct constituted an unequivocal determination to sell, and concluded that tenants had merely *contemplated* selling the Georgetown Building prior to entering the contract of sale with Vogel-Kaufman. The court found that tenants had complied with

the notice and appraisal procedures under Paragraph XVII and that landlords were given proper opportunity to purchase the Georgetown Building at the September 1980 appraised value. It held that once landlords refused to purchase the building within the sixty day period allowed by Paragraph XVII their right to purchase the building terminated. The court granted tenants' motion for summary judgment and denied landlords' cross-motion. On March 30, 1982, the trial court entered judgment for tenants on the complaint of landlords Holland and on third-party landlord Weaver's counterclaim, and granted tenants' prayer for declaratory judgment in count V of their counterclaim. The court found that there was no just reason for delay and directed entry of judgment. Super.Ct. Civ.R. 54(b). On April 15, landlords noted their appeal.

## II

■■ When reviewing a trial court order granting summary judgment, this court makes an independent review of the record. *See Scrimgeour v. Magazine,* D.C.App., 429 A.2d 187, 188 (1981); *cf. Dewey v. Clark,* 86 U.S.App.D.C. 137, 140-41, 180 F.2d 766, 769-70 (1950). Our standard of review is the same as the trial court's standard for initially considering the parties' motions for summary judgment. *See Wyman v. Roesner,* D.C.App., 439 A.2d 516, 519 (1981); *Turner v. American Motors General Corp.,* D.C.App., 392 A.2d 1005, 1006 (1978). We will affirm the entry of summary judgment if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c).[9] *See Ellis v. Safeway Stores, Inc.,* D.C.App., 410 A.2d 1381, 1382 (1979). The role of the court is not to act as factfinder and to resolve factual issues, but

9. The mere fact that the parties to an action made cross-motions for summary judgment does not in itself establish that there is no genuine issue of material fact unless, in narrow circumstances not present here, the motions are based on the same material facts and address the same legal issues. *See Schlytter v.*

*Baker,* 580 F.2d 848, 849-50 (5th Cir.1978); *Begnaud v. White,* 170 F.2d 323, 327 (6th Cir. 1948); *cf. Dell Publishing Co. v. Summerfield,* 198 F.Supp. 843, 844 (D.D.C.1961), *aff'd* sub nom. *Dell Publishing Co. v. Day,* 113 U.S.App. D.C. 1, 303 F.2d 766 (1962) (per curiam).

rather to see if the record demonstrates that there is no genuine issue of material fact on which a jury could find for the non-moving party. *Nader v. de Toledano,* D.C.App., 408 A.2d 31, 42 (1979); *International Underwriters, Inc. v. Boyle,* D.C. App., 365 A.2d 779, 782 (1976). The moving party has the burden of demonstrating clearly the absence of any genuine issue of material fact and entitlement to a judgment as a matter of law. *Ellis v. Safeway Stores, Inc., supra* at 1382; *Nader v. de Toledano, supra* at 42. The party opposing summary judgment is entitled to the benefit of all favorable inferences that can be drawn from the evidence. *Yasuna v. Miller,* D.C.App., 399 A.2d 68, 71 (1979); *Turner v. American Motors General Corp., supra* at 1006. In determining whether an issue of fact exists, the trial court is to examine the pleadings, depositions, and admissions on file together with any affidavits. *Turner v. American Motors General Corp., supra* at 1006; *Burleson v. Burleson,* D.C.App., 277 A.2d 647, 649 (1971).

 In contract cases, like the instant contest over the application of provisions of a lease, summary judgment will not generally be appropriate where interpretation or construction of an integrated agreement depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence. *See, e.g., Glekas v. Boss & Phelps, Inc.,* D.C.App., 437 A.2d 584, 587 (1981). However, summary judgment is appropriate where a contract is unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence. *Cf. id.* at 587–88; *Gagnon v. Wright,* D.C.App., 200 A.2d 196, 198 (1964). Contracts are not rendered ambiguous by the mere fact that the parties do not agree upon their proper construction. *Scrimgeour v. Magazine, supra* at 189. The question of whether a contract is ambiguous is one of law to be determined by the court. *See Clayman v. Goodman Properties, Inc.,* 171 U.S.App.D.C. 88, 96, 518 F.2d

1026, 1034 (1973). In addition, since construction of the terms of a written lease is usually a question of law, summary judgment may be appropriate for resolving a dispute over the respective rights and responsibilities of the parties to a lease. *See E.P. Hinkel & Co. v. Manhattan Co.,* 165 U.S.App.D.C. 140, 143, 506 F.2d 201, 204 (1974).

Applying the foregoing considerations to the present case, we are satisfied that the trial court did not err in concluding, based on the evidence before it, that as a matter of law tenants had not determined to sell the Georgetown Building within the meaning of Paragraph XVII of the lease, at any time prior to their entry into the contract of sale with Vogel-Kaufman on September 17, 1980, and that, therefore, tenants were entitled to summary judgment as a matter of law.

### III

 We address first the proper construction of the phrase "determine to sell." Paragraph XVII of the lease provides:

[I]f Lessee shall determine to sell any of its interests in the leasehold estate created hereby and/or any improvements constructed by it, then the same procedure shall be followed as set out above, with Lessors having the option to buy . . . .

In construing this contractual language we rely on the principles set forth in *Burbridge v. Howard University,* D.C.App., 305 A.2d 245, 247 (1973):

[A] contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly susceptible of different constructions or interpretations, or of two or more different meanings, and it is not ambiguous where the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends . . . .

We conclude that the trial court did not err in deriving its construction of the term "determine to sell"—as an "unequivocal" deci-

sion to "transfer rights in property to another for consideration"—from the unambiguous, plain meaning and usage of the word "determine" [10] in the context of general purposes and intent of Paragraph XVII.

We agree with the trial court that a decision to accept a firm offer from a third party purchaser constitutes a "determination to sell." We agree also that a decision to offer property to another on specific terms and conditions will usually signify a determination to sell.[11] However, we are also of the view, and here we differ with the trial court, that statements, agreements, or other words or conduct on the part of the landlords or tenants, even in the absence of a decision to make or accept a specific offer, might demonstrate an unequivocal determination to sell. Our examination of the record leaves us satisfied that, prior to the Vogel-Kaufman contract

of September 17, 1980, no such determination was reached by tenants.

In construing the parties' agreement, the trial court observed that Paragraph XVII of the Amended Lease created only "reciprocal preemptive purchase rights" and not an absolute, unilateral option on the part of either landlords or tenants to purchase, respectively, the Georgetown Building or the land on which it was built. Such reciprocal rights are variously referred to as "first right to buy," "conditional future option," "right of first refusal," or "right of preemption."[12] 1A A. Corbin On Contracts, §§ 261 at 468, 261A at 483 (1963 & Supp. 1971). Such contract terms are couched in various formulations of words and, hence, construction in a particular case must be determined by specific contract language, the character of the transaction, and the legal relations which it creates. *Id.* at 483.[13]

---

**10.** The word "determine" means in common usage "to fix conclusively or authoritatively ... to settle a question or controversy ... to come to a decision ... to resolve upon ... to turn to a definite resolution or intention ..." *Webster's Third New International Dictionary* at 616 (1971 ed.); *Black's Law Dictionary* 536 (rev. 4th ed. 1968) ("to come to an end, to bring to an end ... to bring to a conclusion").

**11.** We can hypothesize sets of circumstances where such an offer might not constitute a determination to sell. Since the facts of this case do not involve such an offer, we need not pursue this matter.

**12.** The authorities distinguish between such reciprocal rights and an option:

A pre-emption differs materially from an option. An option creates in the optionee a power to compel the owner of property to sell it at a stipulated price whether or not he be willing to part with ownership. A pre-emption does not give to the pre-emptioner the power to compel an unwilling owner to sell; it merely requires the owner, when and if he decides to sell, to offer the property first to the person entitled to the pre-emption, at the stipulated price. Upon receiving such an offer, the pre-emptioner may elect whether he will buy. If he decides not to buy, then the owner of the property may sell to anyone. 6 *American Law Of Property* § 26.64, at 507 (A. Casner, ed. 1952); see also *Mercer v. Lemmens,* 230 Cal.2d 167, 169, 40 Cal.Rptr. 803, 805 (Cal.Dist.Ct.App.1964); *Wellmore Builders*

*v. Wannier,* 49 N.J.Super. 456, 462–64, 140 A.2d 422, 426–27 (N.J.Super.Ct.App.Div.1958).

**13.** None of the cases which appellants cite construes the language—"determine to sell"—which is before us in this case. *See, e.g., Turner v. Shirk,* 49 Ill.App.3d 764, 7 Ill.Dec. 461, 364 N.E.2d 622 (1977); *Vietor v. Sill,* 243 So.2d 198 (Fla.Dist.Ct.App.1971); *Long v. Wayble,* 48 Or. App. 851, 618 P.2d 22 (1980). In *Turner v. Shirk, supra,* the court construed language giving the tenant the first option to purchase if the landlord "desired" to sell by either meeting a bona fide offer or purchasing at a joint appraisal value. The court held that the landlord's executor manifested a "desire to sell" because, having been instructed to dispose of the property after landlord's death, he placed two newspaper advertisements announcing a public auction of the property and put a "for sale" sign on the premises. *Id.* at 7 Ill.Dec. at 463, 364 N.E.2d at 624. The court affirmed the trial court's order that the executor specifically perform the agreement to sell the property to the tenant under the pre-emption clause. In *Vietor v. Sill, supra,* construing "desire to sell," the court held that once the landowner notified the pre-emptive right holders of her intention to sell to a third party on specific terms and conditions, she manifested her "desire to sell"). In *Long v. Wayble, supra,* the court construed a tenant's first right of refusal at a specified asking price of $35,000. In the absence of any specific triggering language, the court held that the landlord's "willingness to sell" was control-

Here, the reciprocal pre-emptive purchase rights of Paragraph XVII were keyed to an "appraisal" value rather than a price set by a specific offer from a third party, but were nevertheless analogous to rights of first refusal or a conditional future option. The court correctly reasoned that the only means of activating the landlords' right to purchase provided for by the lease was tenants' "determination to sell." Therefore, in construing the term "determination to sell" as an unequivocal decision to transfer rights in property to another for consideration, the trial court recognized that Paragraph XVII was drafted to provide an objective basis for determining whether an obligation to sell would arise. It distinguished a mere "intention" to sell from a "determination to sell" and by doing so, avoided the dangers and uncertainties involved in tying a right to purchase to a finding as to the subjective attitudes of landlords or tenants. Such a finding would be especially difficult where, as here, each of the parties is composed of several individuals.

■■■ Appellants' argument rests in important part on the contention that tenants' listing of the property with several brokers raised a fact question with respect to whether they had determined to sell. The trial court properly held that a party's execution of a nonexclusive listing agreement does not manifest its "determination to sell" its interest, but rather it shows that it is contemplating a sale. The court observed that it is commercially reasonable for a party to test the market by listing a property so that it might, from the responses to the listing, develop a better knowledge of what the property is worth and, with that information, weigh the advantage and disadvantage of selling.

The trial court's observations about the utility of listing are particularly apt in the circumstances of this case. One of the tenant partners noted that, in a sense, the Georgetown Building had been for sale from the time it was built. Where a building is built not for the use of the owners but for their profit, such an observation is manifestly realistic. It is not contested in this case that some of the tenant partners were willing to sell only if the transactions left each of them with a net profit of at least one million dollars. The listings were at a price that would have given them a return slightly over a million dollars each. It cannot be said that their willingness to part with their ownership for a profit of that magnitude meant that they had "determined to sell" absolutely, or for whatever price they could get.

■■■ Furthermore, the trial court's conclusion that a listing does not demonstrate a determination to sell comports with well-established case law to the effect that a listing agreement is a mere authorization for a broker to find a purchaser rather than an offer addressed to prospective purchasers or to the public generally. *See, e.g., Gill v. American Security Corp.,* D.C.App., 209 A.2d 629, 631 n. 2 (1965); *cf. Bernstein v. Yee Wong,* 236 F.Supp. 5, 6 (D.D.C.1964). The owner of real property who lists it with an agent generally retains the right to decide whether to accept the offers which the agent brings him.[14] *MacKnight v. Pansey,* 412 A.2d 236, 239 (R.I.1980). Because list-

ling; and that it was manifested by his listing agreement with a broker, a signed agency authorization with the same broker, and his failure to deny his willingness to sell at trial. 48 Or.App. at 851, 856, 618 P.2d at 22, 25. The court ordered the landlord to perform specifically his agreement to sell his property to the tenant at the specified price. Nor is landlords' position bolstered by the other cases they cite. *See, e.g., Chandler & Co. v. McDonald-Weber Co.,* 215 Mass. 365, 102 N.E. 319 (1913); *Estate of Patterson,* 108 Cal.App.3d 197, 166 Cal.Rptr. 435 (Cal.Ct.App.1980); *Superior Portland Ce-*

*ment, Inc. v. Pacific Coast Cement Co.,* 33 Wash.2d 169, 205 P.2d 597 (1949).

14. It is also well established that even an agent with an exclusive power of sale, like one with an exclusive agency, had no implied authority to bind his principal by entering into a contract of sale for the realty, despite the presence in the listing agreement of such terms as "exclusive right to sell" or "sole and exclusive power to sell." *Bernstein v. Yee Wong, supra* at 6; *MacKnight v. Pansey, supra* at 240.

ing agreements do not identify the eventual buyers of the property or express their intention to buy, "it is elementary that listing agreements do not set forth the terms that will later be included in sales contracts to which the listing agreements may eventually lead." *Id.* at 241; *see also Handlos v. Missman,* 7 Wis.2d 660, 667, 97 N.W.2d 419, 423 (1959). Finally, language in a listing to the effect that an owner "will sell to a willing purchaser produced by the broker" is normal to a listing contract and does not bind the owner as against a third party. *Bernstein v. Yee Wong, supra* at 6; *Gallant v. Todd,* 235 S.C. 428, 111 S.E.2d 779, 780–82 (1960).[15]

The trial court concluded that rather than a mere listing, a decision to make or accept an offer on specific terms and conditions to or from another party was necessary to constitute a determination to sell. We agree, generally, with that conclusion.[16] However, as we stated above, we can conceive of other situations where an express statement, agreement or other conduct would objectively and unequivocally manifest a determination to sell. For example, an express statement or agreement by a majority of the tenant's partners that they "will sell the Georgetown Building for the best offer in hand by August 1, 1980" would constitute a determination to sell as of the day of the statement or agreement. However, in this case, such unequivocal conduct was not manifested by the tenant partners until they entered into the contract of sale with Vogel-Kaufman on September 17, 1980.

■ Finally, we address the import of the second sentence of Paragraph XVII. It provides:

If Lessee fails to exercise its option or complete its contract to purchase, Lessors thereafter shall be free for a period of one (1) year to dispose of the interest so

appraised by sale, exchange, or otherwise at such price and upon such terms and conditions as Lessors may determine, without further submission to Lessee and free of all options of Lessee.

Appellants contend that the inclusion of that sentence demonstrates that the parties to the agreement did not intend that the making or acceptance of a specific offer be the only events that would activate the pre-emptive right to purchase. They argue that if the parties had intended that only the making or accepting of a specific offer would trigger that right, there would have been no reason to give the offeror the right to sell its respective interest for one year after the other party turned down the offer. They assert that the one year "grace" period would be meaningless since the offeror would simply and immediately execute the contract which triggered the pre-emptive right.

This contention assumes that once a party makes or accepts a specific offer, failure of the holder of the pre-emptive right to complete the purchase would necessarily lead to consummation of that contract, thus obviating the necessity for the grace period. The trial court adequately disposed of this assertion by noting that, even though a contract for sale has been executed, that sale may never be completed because the parties may fail to go to settlement. In that event, the offeror would still hold title to the property and would be able to convey it to another purchaser. This clause reasonably accommodates that contingency. *Cf. Schooler v. Schooler,* 84 U.S.App.D.C. 147, 150, 173 F.2d 299, 302 (1948). Moreover, as appellants argue and we agree, there can be a determination to sell in the absence of the making or accepting of a specific offer. In that circumstance, the one-year period following failure to exercise a pre-emptive right would be meaningful. *See E.P. Hinkel & Co. v. Manhattan Co., supra,* 165 U.S.

---

**15.** The fact that tenants would have been willing to sell if the high listing price had been offered does not raise a fact issue as to whether they had "determined to sell" in the absence of such an offer.

**16.** *See* note 11, *supra,* and accompanying text.

App.D.C. at 143, 506 F.2d at 204. We are therefore satisfied that the trial court's definition of "determine to sell" is not inconsistent with the second sentence of Paragraph XVII.

For all of the foregoing reasons, we cannot fault the trial court's construction of the term "determine to sell" as "an unequivocal decision to transfer rights in property to another for consideration."

### IV

We now proceed to review the trial court's holding that, as a matter of law, tenants determined to sell the Georgetown Building only upon entering into a firm contract of sale with Vogel-Kaufman on September 17, 1980, and not before.

■ Appellants' central contention on this issue is that listing agreements, correspondence, and other conduct beginning in August 1979, were objective manifestations of the tenants' determination to sell, and raised issues of fact as to when tenants determined to sell their interest. Appellants maintain that language in the listing agreements and in correspondence between the partners, as well as between the partners and various brokers, to the effect that the tenant "desired" to sell, or "concluded" to sell or "will sell," were admissions that the tenant had "determined to sell" the Georgetown Building as early as its 1979 listing agreement with Coldwell Banker. Appellants also contend that the tenants conducted an "ongoing marketing campaign" by entering into a number of nonexclusive listing agreements with different brokers from August 1979 to September 1980, and that this constituted probative evidence of its determination to sell. Appellants further assert that tenants' only disagreement over selling the Georgetown Building concerned price, and did not affect their determination to sell. Finally, appellants contend that the tenants had ample motive to refrain from notifying appellants

of its listing agreements in August 1979 because, contemporaneously, they were conducting rental negotiations for the property with appellants and did not want to contradict their position during the negotiations that they needed a lower ground rent in order to make their operation economically viable. We hold that, under the circumstances, these matters did not suffice to raise a triable issue of fact concerning the tenants' "determination to sell."

For the reasons we assigned above in discussing the commercial utility of listing where an owner wishes to consider the advantages or disadvantages of selling, the use of the terms "desire to sell" or "will sell" in form listing agreements, without more, fails in the circumstances of this case to raise a fact issue concerning an unequivocal decision to sell the Georgetown Building to a third party. *See, e.g., Bernstein v. Yee Wong, supra* at 6. Nor does the fact that tenants authorized listing of the Georgetown Building for approximately one year tend to prove that they had made an unequivocal determination to sell.[17] While it may be true, as appellants urge, that partners could "determine to sell" the Georgetown Building even while disagreeing about the price term, the undisputed evidence in this case established that they did not do so. Finally, we find that tenants' motive for concealing its listing agreements from the appellants during their ground rent negotiations is so remotely related to tenants' "determination to sell," as we have defined it, that it has no significant probative value. We are satisfied that appellants' assertions, collectively, do not raise genuine factual questions about the tenants' "determination to sell" as we have construed that term.

Our review of the record confirms that the only "determination" made by the tenant's partners was to list the building with Coldwell Banker in August 1979 and to enter into other nonexclusive listing agree-

---

**17.** In this regard, we note that the tenant's partners rejected two offers at prices equivalent to or higher than the Vogel-Kaufman offer of $6.1 million. Rucker Associates also offered $6.1 million and Burleith Realty Company offered $6.215 million.

ments with various brokers in order to ascertain whether an acceptable offer for the Georgetown Building would be received. Although the tenant's listing agreements and the partners' correspondence with each other indicate their *interest* in selling the Georgetown Building, in securing certain prospective purchasers, in getting a certain price, and in achieving other favorable sale terms, we agree with the trial court that the most that can fairly be inferred from the evidence is that the partners, as a group, did no more than contemplate sale of the building. Indeed, our review of the record bears out that tenants "unequivocally" decided to sell the Georgetown Building only after Goldstein and Norair threatened in their September 4, 1980, letter to dissolve the tenant's partnership if the Vogel-Kaufman offer were not accepted by Hannan and Dobricky. The terms upon which the tenant partners determined to sell the Georgetown Building were set forth in the contract of sale between tenants and Vogel-Kaufman on September 17, 1980. Thereafter, appellants failed to exercise their purchase rights under Paragraph XVII, thus terminating their rights to purchase the Georgetown Building.[18]

For the foregoing reasons, we hold that the trial court did not err in determining that there were no genuine issues of material fact concerning the point in time at which the tenant's partners determined to sell the Georgetown Building.

*Affirmed.*

---

**18.** Many of the cases which appellants cite, unlike the present one, involved suits for specific performance brought by either the landlord or tenant, respectively, because of the other party's failure to comply with the specific contractual terms of the pre-emptive right at issue. *See, e.g., Turner v. Shirk, supra* (tenant awarded specific performance because of landlord's refusal to sell his interest to tenant after tenant's pre-emptive right vested because of landlord's "desire" to sell his interest); *Long v. Wayble, supra* (reversing trial court's denial of specific performance to tenant for landlord's failure to give tenant first right of refusal at the asking price specified in the lease of $35,000 upon landlord's entry into a contract of sale of his property with a third party at $49,900); *Vietor v. Sill, supra* (reversing trial court's denial of specific performance to a pre-emptive right holder for the landowner's failure to comply with a contract obligating her to sell her apartment to the pre-emptive right holder on the same terms as those contained in a third party's offer to her). Here, landlords do not and cannot contend that appellees failed to give them an opportunity to act under the pre-emptive right and appraisal provisions of Paragraph XVII. Rather, they are seeking the right to act under those provisions as of a date more than a year prior to the date of the Vogel-Kaufman contract so that they might have the advantage of the property's previous lower value in a rising real estate market.