In re CAFE PARTNERS/WASHINGTON 1983, A New York Limited Partnership, Debtor.

**Bankruptcy No. 87–00939.**

United States Bankruptcy Court, District of Columbia.

July 22, 1988.

See also, Bkrtcy., 81 B.R. 175.

Brian Seeber, Washington, D.C., for debtor.

Robert Greenberg, for movant.

**MEMORANDUM OPINION RE LANDLORD'S MOTION FOR SUMMARY JUDGMENT THAT LEASE BE DEEMED REJECTED**

S. MARTIN TEEL, Jr., Bankruptcy Judge.

The Debtor has filed a Motion for Authority to Assume and Assign Unexpired

Lease of Real Property and To Determine Required Cure Related Thereto. Docket Entry ("DE") No. 83. The subject lease ("the Lease") relates to premises at Washington Harbour, a development located along the Potomac River in the Georgetown section of the District of Columbia. The Debtor used the leased premises to conduct operations as Potomac Restaurant, a large up-scale restaurant. Upon the filing of the petition herein, the Debtor had ceased operations. The Debtor has determined that instead of resuming operations, the best interest of creditors lies in assignment of the Lease in exchange of the payment of funds sufficient to make a meaningful distribution to creditors.

The Debtor has entered into a letter of intent with Ark Restaurant Corporation ("Ark") providing for the sale to Ark of the Debtor's leasehold interest and tangible personal property in exchange for a cash payment to the estate of $400,000. Pursuant to the Lease the Landlord made two loans in the amounts of $1,000,000 and $648,000 to the Debtor. Ark's proposal is conditioned on "receipt of a final determination by the Bankruptcy Court for the District of Columbia that the loans by the landlord under the Lease to the Partnership in the aggregate amount of $1,648,000 are not additional rent due under the Lease." (DE No. 83, Ex. 4.) The Debtor's motion seeks a determination that the $1,648,000 in loans are not additional rent due under the Lease. The Debtor states that despite intensive sale efforts the Ark proposal is the only firm offer received. (DE No. 83 at para. 24.)

Washington Harbour Associates, Limited Partnership, ("the Landlord") has opposed the Debtor's motion and filed a crossmotion for summary judgment declaring that the Lease be deemed rejected, contending that the $1,648,000 in loans are amounts that must be paid as part of the Lease if it is to be assumed and assigned. (DE No. 84.)

1. Although there was also an "Amendment and Modification dated August 1, 1986," neither par-

## FACTS

The initial lease agreement dated September 16, 1983, was executed by the Landlord and LeRoy Productions, Inc., as tenant. (DE No. 83, Ex. 1.) By an assignment and assumption agreement dated September 26, 1983, and consented to by the Landlord on October 27, 1983, LeRoy Productions, Inc. assigned its rights under this lease agreement to the Debtor. Aside from the lease agreement dated September 16, 1983, the pertinent documents controlling the terms of the Lease as it now exists are a letter agreement dated September 19, 1983 (DE No. 83, Ex. 2), an Amendment and Modification To Lease Dated As Of September 16, 1983, executed on February 18, 1986 (DE No. 83, Ex. 3), and a Third Amendment and Modification To Lease executed on February 27, 1987. (DE No. 91, Ex. 1 to Declaration of Alan Garmise).[1] Also relevant to the dispute is a Subordination Agreement of February 8, 1984 (Plaintiff's Ex. 12 to an earlier hearing on a motion from relief from the automatic stay in this case).

The initial lease document is lengthy, but the terms pertinent to the pending motion for summary judgment are in comparison brief. Article II (styled "Rent") provided for the rents to be paid under the lease. Section 2.01 provided for a "Minimum Rent," including annual rent. Section 2.02 provided for a "Percentage Rent" based on the Debtor's gross sales and Section 2.03 provided that:

"Rent" shall be defined in this Lease as Minimum Rent and Percentage Rent only, which sums shall be payable in the manner provided in the Lease. All other sums of money or charges required to be paid by Tenant under this Lease (hereinafter referred to as "Additional Rent") shall be due and payable ten (10) days after notice thereof, without any deductions or setoffs whatsoever, unless otherwise stated herein. Tenant's failure to pay any such amounts or charges set forth in this Lease when due shall carry with it the same consequences under Ar-

ty has relied upon that document.

ticle XVII hereof as Tenant's failure to pay Rent.

Article V ("Site Plans and Improvements to Leased Premises") divided construction work to be performed on the premises into Landlord's Work (Ex. "C" to the lease) and Tenant's Work (Ex. "D" to the lease). In Section 5.06(b) the Tenant's Work (Ex. "D" to the lease). In Section 5.06(b) the Landlord agreed to pay the Debtor the sum of $175,000 towards the cost of landscaping and screening of the outdoor garden dining area. Section 5.06(c) provided:

> In addition to any sums to be expended by Landlord in the performance of its work pursuant to Section 5.06(a), above, and in addition to Landlord's contribution toward the cost of landscaping and screening of the garden dining area pursuant to Section 5.06(b), above, Landlord shall pay to Tenant the sum of One Million Seventy-four Thousand Four Hundred Seventy-four Dollars ($1,074.474.00) as a contribution toward the cost of Tenant's Work.

Article XVI ("Default of Tenant") provided in Section 16.01:

> A Default under this Lease shall be defined as the occurrence of any one or more of the following events (herein called a "Default"):
>
> *   *   *   *   *   *
>
> (g) If Tenant shall fail to pay any installment of Rent or Additional Rent, or any other charge required to be paid by Tenant hereunder, when the same shall become due and payable, and such failure shall continue for five (5) days after notice.

Section 16.02 provided:

> Upon the happening of any one or more of the aforementioned Defaults, Landlord shall have the right, at its sole option, to terminate this Lease by giving Tenant notice of Landlord's intention to end the term of this Lease at the expiration of five (5) days from the date of service of such notice. At the expiration of such five (5) days, if all such Defaults shall not then have been cured, this Lease and the Term hereof, as well as all of the right, title and interest of Tenant hereunder shall wholly cease and expire, and Tenant shall then immediately quit and surrender the Leased Premises to Landlord.

Section 21.14(d) of the Lease provided:

> No change or modification of this Lease or of any of the provisions hereof shall be valid or effective unless the same is in writing and signed by the parties hereto. No alleged or contended waiver of any of the provisions of this Lease shall be valid or effective unless in writing signed by the party against whom it is sought to be enforced. This Lease contains the entire agreement between the parties hereto and there are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between them other than as herein set forth. This Lease is intended by the parties hereto to be an integration of all prior and contemporaneous promises or agreements, conditions, or undertakings between the parties hereto.

Section 21.14(1) provided that the Lease was to be construed in accordance with the laws of the District of Columbia.

The letter agreement to the Lease (DE No. 83, Ex. 2) provided in its entirety:

> We have this day entered into a lease covering approximately 22,323 square feet of floor area and a garden dining and preparation area at Washington Harbour.
>
> Pursuant to the provisions of Section 5.06(c) of the lease, the Landlord will pay to the Tenant the sum of $1,074,474.00 towards the tenant's cost of construction.
>
> Although referred to in the lease as a contribution by the Landlord towards the cost of Tenant's work, $1,000,000.00 of the said sum is actually an interest bearing loan from the Landlord to the Tenant, being repayable in constant annual installments of $160,000.00 each, throughout the 40–year initial term of the lease.
>
> The said sum of $160,000.00 per annum has been added to the annual rentals and has been factored into the per square foot rentals contained in Article II as

well as into the calculation of the annual sales break point.

It is the intention of the parties that Tenant shall have and Tenant is hereby granted the right at any time to prepay any unpaid balance of said $1,000,000.00 with interest thereon to date of prepayment, subject only to such prepayment not being prohibited by the terms of any loan agreements between Landlord and the sources of Landlord's financing.

In order to implement and carry out the said intention of the parties, the Landlord agrees to use its best efforts to secure any necessary permission from its lender(s) which may be required to authorize said prepayment.

In the event that Tenant does prepay as herein provided the lease shall be deemed modified, *mutatis mutandis*, to reflect the fact that said prepayment has been made.

The Amendment and Modification to Lease Dated As September 16, 1983, executed on February 18, 1986 (DE No. 83, Ex. 3), in paragraph 16 provided:

Landlord agrees to advance to Tenant the amount of $648,083 on the Opening Date of the restaurant as a loan advance on account of Tenant's leasehold improvements and other construction work in connection with the Leased Premises. *Upon the making of such advance by Landlord, such loan shall be repaid by increasing the Minimum Rent under the Lease by $180,000 per year for years 1 through 5 of the Lease term only, such annual amount to be payable on account of year 1 annually in arrears on the first anniversary of the Commencement Date and to be payable on account of years 2 through 5 by equal monthly payments made in arrears in the amount of $15,000 each.* Such Rent shall not be subject to increase due to increase in the Consumer Price Index. [Emphasis added.]

The Third Amendment and Modification to Lease (DE No. 91, Garmise Declaration,

Ex. 1) by its paragraph 6 amended the sentence emphasized in the language quoted immediately above to read as follows:

Upon the making of such advance by Landlord, such loan shall bear interest at the rate of 9% and shall be repaid as follows: (1) accrued interest for the period July 31, 1986 to July 31, 1987 shall be paid on August 1, 1987; (2) interest for the months of August, September, October, November and December of 1987 shall be paid monthly in arrears on the first business day of the following month and (3) commencing with the month of January 1988, the loan shall be amortized in 48 equal payments of $16,127.56 each, made in arrears on the first day of the following month.

Although this Amendment deleted any reference in the sentence being amended to treatment of the loan as Minimum Rent under the Lease, the last sentence of paragraph 16 of the document executed on February 18, 1986, remained the same and referred to this loan as Rent.

By the Subordination Agreement,[2] the Landlord, the Debtor, and the Royal Bank and Trust Company ("The Bank") agreed that the Landlord would subordinate any interest or liens it might have in the collateral subject to the security interest of the Senior Creditor. The collateral for the security interest included all accounts receivable, contract rights, goods, equipment, inventory, fixtures, furniture and all other personal property of every type and nature of the Debtor, including, but not limited to, all leasehold improvements on the subject premises. But it was expressly understood and agreed that the Bank's collateral was not to include any interest in the subject lease. Subordination Agreement at 1–2. Section 5 of the Subordination Agreement provided:

The Junior Creditor [i.e., the Landlord] agrees that upon the bankruptcy of Cafe Partners or termination of the Project Lease by reason of Cafe Partners' default thereunder, the Junior Creditor

---

**2.** Plaintiff's Ex. 12 at the earlier hearing on the motion for relief from the automatic stay filed by the Landlord.

shall not make a separate claim for repayment of the financing provided by the Junior Creditor to Cafe Partners pursuant to Section 506 of the Project Lease. The Junior Creditor's sole claim for repayment of said financing shall only be as part of its claim for, and only to the extent it may make a claim for, the rent payable by Cafe Partners under the Project Lease.

In opposition to the motion for summary judgment, the Debtor filed the Declaration of Alan Garmise (DE No. 91.) Mr. Garmise, who was personally involved on behalf of the Debtor and LeRoy Productions, Inc. in negotiating the Lease (including the amendments thereof and the loans made incident thereto), states:

At all times, the Lease and the loans have been treated by both Cafe Partners and the Landlord as separate and distinct transactions, and it has never been the intention of the parties to those transactions to treat loan payments as rent under the Lease. This is confirmed by the documents relating to the Lease and the loans as well as the statements and conduct of the parties to the agreements. * * * [T]he Landlord's representative, Herbert Miller, stated that he needed to include the $1,000,000 loan payments as part of the rent payments under the Lease to avoid problems with the Landlord's own lender. We reluctantly acquiesced but insisted that proper documentation be provided to make clear that the transaction was in fact a loan and had nothing to do with rent under the Lease. The Landlord agreed, and this agreement was embodied in the Letter Agreement dated September, 1983.

Other documents also confirm that both the $1,000,000 loan and the subsequent $648,000 loan are transactions separate and apart from the lease. Paragraph six of the Third Amendment to the Lease, dated February 27, 1987 contains a detailed repayment schedule with respect to the $648,000 loan. The payment provi-

sion does not mention rent nor are the payments linked to the rent. * * * Cafe Partners [sic] Private Placement Memorandum, dated April 4, 1983, also states that the landlord would provide "financing" to Cafe Partners in the amount of $1,000,000. * * *

Consistent with the terms of the documents and the parties' intentions, LeRoy Productions and Cafe Partners have always treated the loans as loans, not as rent. Loan payments are treated as such in our financial books and records, while rent payments under the Lease are accounted for separately. Similarly, we treat the loan payments differently from the rent payments for tax purposes.

[The Landlord] states * * * that these loans are simply examples of a landlord's contribution for tenant buildout of the leased premises, which are reflected in the rent payments. However, Cafe Partners received from Landlord a $250,000 allowance for buildout of the restaurant garden space, wholly separate from the loans. By contrast, our use of the loan proceeds was not restricted to buildout costs, but rather we were permitted to and did use those proceeds as part of the restaurant's initial capitalization. * * *[3]

## DISCUSSION

### I.

Under Section 365 of the Bankruptcy Code a Debtor may assume an executory contract, but in so doing must assume both the benefits and the burdens of the contract; the Debtor may not pick and choose from the desirable and undesirable portions of the contract. *In re Italian Cook Oil Corp.*, 190 F.2d 994 (3rd Cir. 1951); *Atchison, T. & S.F. Ry. Co. v. Hurley*, 153 F. 503 (8th Cir.1907), *aff'd*, 213 U.S. 126, 29 S.Ct. 466, 53 L.Ed. 729 (1909). With respect to a lease, the Bankruptcy Code permits a debtor to cure defaults notwithstanding a provision in the lease

---

**3.** The Debtor submitted a second Declaration of Alan Garmise (DE No. 103) reciting essentially the same facts and stating that "it was never our intention or understanding that a failure to make *loan* repayments would constitute an event of default under the Lease permitting an eviction or other summary remedies for nonpayment of *rent*." (Emphasis in original.)

requiring termination due to insolvency, the commencement of a bankruptcy case or the appointment of or taking possession by a Trustee or custodian of the debtor's assets (Section 365(b)(2)) and overrides any lease provision restricting the ability of the debtor to assign the lease to a third party (Sections 365(f)(1) and 365(k)). *In re Pin Oaks Apartments,* 7 B.R. 364, 367 (Bankr. S.D.Tex.1980). But the rule that a debtor must accept both the burdens and the benefits of the contract otherwise applies to the assumption of a lease. *In re Holland Enterprises, Inc.,* 25 B.R. 301, 303 (E.D.N.C. 1982); *Pin Oaks Apartments* at 369–70; *In re Diamond Head Emporium, Inc.,* 69 B.R. 487, 494 (Bankr.D.Haw.1987).

■ The consequence is that interdependent provisions of a lease agreement may not be restructured into a series of separate agreements. *Holland Enterprises* at 303; *In re Diamond Head Emporium* at 494; *In re Storage Technology Corp.,* 53 B.R. 471, 476 (Bankr.D.Colo. 1985). However, a single document may contain separate and distinct contracts and the debtor may choose to assume one of those contracts without assuming the other. *In re Gardinier, Inc.,* 831 F.2d 974 (11th Cir.1987), *aff'g* 50 B.R. 491 (Bankr.M. D.Fla.1985). *See In re Pacific Exp., Inc.,* 780 F.2d 1482, 1488 (9th Cir.1986). As *Gardinier, Inc.* illustrates, whether a contract of lease is an entire contract is not a question of the Federal bankruptcy law but of the law, usually State law, that would govern the parties' rights outside bankruptcy.

With these principles in mind, we examine first the law of the District of Columbia as to when an agreement will be treated as an entire contract instead of separate and distinct contracts.

## II.

In *Holiday Homes v. Briley,* 122 A.2d 229, 232 (D.C.1956), the Court stated:

Whether a number of promises constitute one contract or more than one is primarily a question of intention of the parties. In ascertaining this intention, consideration may be given to whether the parties assented to all the promises as a single whole, and to whether the consideration was given for each part as a separate unit or whether there was a single consideration covering the various parts. [Footnote omitted.]

In *Bethea v. Investors Loan Corp.,* 197 A.2d 448, 450 (D.C.1964), the Court further stated that "the essential test is 'whether the parties assented to all the promises as a single whole, so that there would have been no bargain whatever if any promise or set of promises were struck out.' 3 Williston on Contracts, Section 863 (Rev.Ed. 1936)." In *Royal McBee Corp. v. Bryant,* 217 A.2d 603 (D.C.1966), to illustrate, a contract containing terms for the lease and maintenance of a typewriter constituted an entire contract and not two separate contracts of lease and maintenance, even though the amounts to be paid for the lease and for the maintenance of the typewriter were separately stated under the contract. The lessor's maintenance of the typewriter was intended to be a condition to the lessee's obligation to make payments.

## III.

■ We next apply the foregoing principles to the subject Lease by first considering the Lease documents themselves.

The Lease makes clear that the loans were to be treated as either "Rent" or as "Additional Rent" (as those terms were defined in Section 2.03 of the Lease). The letter agreement recited that the $1,000,000 loan was to be repayable at the rate of $160,000 annually *and that the said sum of $160,000 had been added to the annual rentals,* a component of the "Minimum Rent" under Section 2.01 of the Lease and hence a part of "Rent" as that term is defined in Section 2.03 of the Lease.

Initially, the $648,000 loan was expressly to be repaid by increasing the Minimum Rent under the Lease by certain amounts. Later, when the sentence referring to repayment was amended to change the repayment schedule, the reference to repayment being made by increasing Minimum Rent was deleted, but the next sentence

still referred to the amounts as such "Rent."

It is thus clear that both loans were "Rent" under the Lease. In any event, they would be "Additional Rent" as additional sums due under the Lease even if they were not "Rent."

The Lease documents clearly provide that the use of the subject premises is conditioned upon, among other things, timely payments of the amounts owed pursuant to the Lease, including all Rent and Additional Rent, Lease Sections 2.03, 16.01 and 16.02. The Lease documents are thus unambiguous that this is an entire contract, that is, that the use of the premises was not intended to be treated as a separate and distinct transaction from the loans, but to be conditioned on their timely repayment. Thus, as in *Royal McBee Corporation v. Bryant*, 217 A.2d 603 (D.C. 1966), the use of the premises and the loans cannot be separated into two contracts.

The Debtor argues that Section 365(a) speaks of assumption of a lease and that the loan repayments here are not rent, as that term is ordinarily used, under a lease. The Debtor thus urges that the arrangement here consisted of (1) a set of loans with the amount of repayments clearly stated and (2) a lease of real property with the true rent for use of the property (as opposed to loan repayments) clearly stated. The Debtor argues that it is only the lease of premises that the Debtor seeks to assume, and that the Debtor ought to be able to reject the loans as not being part of the Lease aspects of the arrangement.

Although the Lease documents here present an arrangement different than the usual lease of real property encountered in the caselaw, they nevertheless are the agreement the parties bargained for. The agreement cannot be rewritten to accommodate a view of what a lease ought to look like in traditional terms—use of real property conditioned on payment of what is traditionally thought of as rent and not as repayment of loan amounts. The parties were free to make the repayment of loans an independent promise having no effect on the Debtor's use of the premises but they chose not to. Whether the loan repayments can be properly characterized as "rent" within any traditional meaning of that term is immaterial. Nor is it material whether the loan amounts were restricted to use for construction on the leased premises. What counts is that the loan repayments clearly were a condition of the Debtor's use of the subject premises under Lease sections 2.03, 16.01 and 16.02.

The Debtor and the Royal Bank and Trust Company placed reliance at oral argument on the Subordination Agreement, whereby the Landlord agreed to subordinate its loans as to certain collateral securing loans by the bank. They argue that treating the loans as amounts to be repaid under the Lease does violence to the Subordination Agreement by giving the Landlord a priority for its loans.

This argument must be rejected. The Subordination Agreement would not be violated if the Lease is construed to include the loan repayments because the Bank's priority in the collateral specified by the Subordination Agreement would not be altered by this construction. The Lease, for example, could be assigned with all rents (including any arrearages) to be paid by the assignee. Such payments would not violate the Subordination Agreement. The parties to the Subordination Agrement, moreover, expressly agreed that the loans could be repaid in a bankruptcy case as part of any claim the Landlord could make for rent payable under the lease [4] although it would not otherwise be claimed in the case.[5]

**4.** *See* 11 U.S.C. Sections 502(b)(6) and 502(g) (claim for damages for terminated or rejected lease) and 11 U.S.C. Sections 365(b)(1)(A), 365(d)(3) (claim for rent on lease of nonresidential real property until lease assumed or rejected).

**5.** Similarly, the Court must reject the Debtor's and the bank's policy argument that the Landlord will be placed in a superior position vis-a-vis other unsecured creditors if the assumed Lease carries with it the requirement to pay the loans. This argument really does not turn on the law of the District of Columbia regarding contract interpretation but on these parties'

Accordingly, unless the Debtor is allowed to present extrinsic evidence contradicting the plain meaning of the Lease documents on their face, this case is controlled by the rule that the Debtor may not rewrite interdependent provisions of a contract into separate and distinct contracts allowing the Debtor to pick and choose among the beneficial aspects of the contract. *In re Holland Enterprises, Inc.*, 25 B.R. 301 (E.D.N.C.1982).

## IV.

■ The Debtor has attempted to vary the written language of the Lease by introducing the declarations of Alan Garmise. That effort must fail. As stated in *Scrimgeour v. Magazine*, 429 A.2d 187, 188 (D.C.1981).

Where as here a contract contains an integration clause (*i.e.*, providing that the contract sets forth all promises, agreements, conditions and understandings between the parties), the "written language embodying the terms of an agreement will govern the rights and liabilities of the parties ... unless the written language is not susceptible of a clear and definite understanding, or unless there is fraud, duress or mutual mistake." *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 371, 137 A.2d 687, 693 (1958) cited in *Minmar Builders, Inc. v. Beltway Excavators, Inc.*, D.C.App. 246 A.2d 784, 786 (1968).

This is a recitation of the parol evidence rule and the related "plain meaning" rule of contract interpretation. *Lee v. Flintkote Co.*, 593 F.2d 1275, 1280–81 (D.C.Cir.1979); *District Realty Title Ins. Corp. v. Ensmann*, 767 F.2d 1018, 1022 (D.C.Cir.1985); *Providence Hosp. v. Group Hospitalization, Inc.*, 494 A.2d 639 (D.C.1985); *Stamenich v. Markovic*, 462 A.2d 452, 455 (D.C.1983); *Holland v. Hannan*, 456 A.2d 807, 815 (D.C.1983). Under the parol evidence rule, evidence of antecedent understandings and negotiations are not admitted for the purpose of varying or contradicting a writing. *Lee v. Flintkote Co.* at 1280 n. 25. The plain meaning rule, in turn, "prohibits consideration of extrinsic evidence of intent when the contract is unequivocal." *Id.* at 1281 (footnote omitted). The disagreement of the parties as to the contract's proper construction does not render the contract ambiguous; that is a question for the Court. *Scrimgeour v. Magazine* at 189; *Lee v. Flintkote Co.* at 1281. A contract is ambiguous only when it is "reasonably susceptible of different constructions or interpretations." *1901 Wyoming Coop. Ass'n v. Lee*, 345 A.2d 456, 461 n. 7 (D.C.1975).

■ A contract is unambiguous "when the court can determine its meaning without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends." *Burbridge v. Howard Univ.*, 305 A.2d 245, 247 (D.C.1973); *Holland v. Hannan*, 456 A.2d 807, 815 (D.C.1983). As stated in *1010 Potomac Assocs. v. Grocery Mfrs. of Am.*, 485 A.2d 199, 205 (D.C.1984):

If the document is facially unambiguous, its language should be relied upon as providing the best objective manifestation of the parties' intent. * * * Extrinsic evidence of the parties' subjective intent may be resorted to only if the document is ambiguous. * * * However, extrinsic evidence may be considered to determine the circumstances surrounding the making of the contract * * * so that

views of what ought to be the consequence of an assumption of a lease. Congress has already made the policy choice that when a debtor assumes a lease advantageous to the estate the entire obligations of the lease must be assumed even though the obligations thereunder (such as unpaid prepetition rent) might not otherwise enjoy a priority. *In re Coast Trading Co.*, 744 F.2d 686, 692 (9th Cir.1984) (obligations under an assumed executory contract as payable as an administrative expense priority). The requirement that assumption of a lease or executory

contract includes its unfavorable aspects can result, in many ways, in the creditor who is party to the lease or executory contract receiving more favorable treatment than other creditors. *Compare In re Monsour Medical Center*, 11 B.R. 1014 (W.D.Pa.1981), *aff'g* 8 B.R. 606 (Bankr.W.D.Pa.1981) (recoupment permitted creditor-party to assumed executory contract) *with Lee v. Schweiker*, 739 F.2d 870, 875–76 (3rd Cir.1984) (recoupment forbade as to creditor not party to an assumed executory contract).

it may be ascertained what a reasonable person in the position of the parties would have thought the words meant. [Citations and footnotes omitted.]

The facial language of the Lease documents here, as previously noted, unambiguously provides that the loan amounts were to be repaid as a condition to the Debtor's use of the premises. The "simple facts" necessary to place the lease language in context are that the Landlord leased premises to the Debtor and made two loans to the Debtor, with a provision that they were to be repaid as part of rent under the Lease.

None of the circumstances shown by the Garmise declarations alters the context in which the Lease was entered into. First, his statement that the $1 million loan payments were included as part of the rent payments under the Lease in order to avoid problems with the Landlord's lender merely confirms that the loan payments were to be rent payments. The motivation of the parties in including the loan payments under the Lease does not change the fact that the parties objectively agreed that timely payment of the loans was a condition of the Debtor's retaining possession of the leased premises. Intent is properly an objective issue. *Flippo Constr. Co. v. Mike Parks Diving Corp.*, 531 A.2d, 263, 269 (D.C. 1987); *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1093 (D.C.1988).

Second, the Debtor's characterization of the $1,000,000 loan as "financing" in its Private Placement Memorandum does not add anything: all agree that these were loans.

Third, Mr. Garmise states that the Debtor treated the loans as loans and not as rent on its financial books and records and for tax purposes. This fails to negate the clear facial language of the Lease documents requiring that the loans be repaid as a condition to the Debtor's use of the premises. Whether the loans properly should be classified as "rent" for tax or accounting purposes is simply not the issue before this Court; what is important is whether repayment of the loans was a condition to the use of the premises.

Finally, even if the Landlord did not restrict use of the loans to finance tenant buildout of the lease premises, this would not alter the plain facial language of the Lease.

Mr. Garmise's declaration otherwise contains conclusory assertions presenting a classic violation of the parol evidence rule whereby he attempts subjectively to give the Lease an interpretation to which it is not susceptible from an objective standard.

Accordingly, on this record the Lease must be interpreted as requiring payment of the loans as a condition to use of the subject premises, such that the Lease cannot be assumed without assumption of the loan repayment obligations.

### V.

The Debtor argues that summary judgment is inappropriate because (1) intent is an issue peculiarly not susceptible to summary judgment determination and (2) discovery has not been completed.

The first contention must be rejected because the contract interpretation issue here is one of objective, not subjective intent. Where, as here, a contract is unambiguous, summary judgment is appropriate. *Lee v. Flintkote*, 593 F.2d 1275 (D.C.Cir. 1979); *E.P. Hinkel & Co. v. Manhattan Co.*, 506 F.2d 201, 204 (D.C.Cir.1974); *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983); *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1092 (D.C.1988).

The second contention must be rejected because no affidavit has been filed under Rule 56(f) of the Federal Rules of Civil Procedure to establish the necessity of further discovery to oppose the motion for summary judgment.[6] The Court is not required to delay ruling on a motion for

---

6. Rule 56(f) provides:
   *When Affidavits are Unavailable.* Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or dis-

summary judgment simply because discovery has not been completed. *United States v. Light,* 766 F.2d 394, 397 (8th Cir.1985); *Brown v. Chaffee,* 612 F.2d 497, 504 (10th Cir.1979). A Rule 56(f) affidavit can delay entry of summary judgment if it appears from the affidavit that further discovery is necessary to gain evidence essential to an opposition to the summary judgment motion. However, the failure to file a Rule 56(f) affidavit permits a court to grant summary judgment despite discovery not being completed. As stated in *Mid–South Grizzlies v. National Football League,* 720 F.2d 772 (3rd Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984): "[m]ost courts which have considered the issue agree that filing an affidavit is necessary for the preservation of a Rule 56(f) contention that summary judgment should be delayed pending further discovery." *Id.* at 780 n. 4 (citations omitted). *See also Shavrnoch v. Clark Oil and Ref. Corp.,* 726 F.2d 291 (6th Cir.1984); *Over the Road Drivers, Inc. v. Transport Ins. Co.,* 637 F.2d 816 (1st Cir.1980); *Thi–Hawaii, Inc. v. First Commerce Fin. Corp.,* 627 F.2d 991 (9th Cir. 1980). Here the only affidavits submitted by the Debtor, the declarations of Alan Garmise, do not establish that the Debtor "cannot for reasons stated therein present by affidavit facts essential to justify [its] opposition" as required by Rule 56(f). To the contrary, the declarations recite that Mr. Garmise was personally involved on behalf of the Debtor in the negotiations leading to the Lease (including the amendments to the initial lease document). No suggestion is made in his declarations that he is not fully cognizant of the "circumstances surrounding the making of the contract" (*1010 Potomac Assocs. v. Grocery Mfrs. of Am.,* 485 A.2d 199, 205 (D.C.1984)) and Debtor concedes that Mr. Garmise's declarations discuss those circumstances. DE No. 107 at 10. On brief (DE 91 at 10) the Debtor argues that it

> is entitled to discovery of the Landlord's perspective on the events surrounding the making of the loans. To illustrate, Cafe Partners needs to depose the persons involved in the transactions and to

covery to be had or may make such other

review the Landlord's tax, financial, and accounting records to ascertain how the Landlord treated Cafe Partners' payments on its books.

Even if this argument had been placed into an affidavit, it would not suffice to carry the Debtor's obligation under Rule 56(f). The treatment of the loans on the Debtor's books (as already ruled) does not alter the plain language of the Lease and neither could the treatment on the Landlord's. The discovery sought would only be a fruitless frolic to gather parol evidence in an attempt to vary the plain meaning of the Lease. The Court is not required to allow the Debtor a delay to gather evidence that would be barred by the parol evidence rule. *United States v. Light,* 766 F.2d 394, 398 (8th Cir.1985).

CONCLUSION

The Landlord's motion for summary judgment that the lease be deemed rejected must be granted. The Debtor has only moved to assume the Lease in order to assign it and has been unable by its own admission to obtain an assignee who is willing to take the Lease subject to the obligation to repay the $1,648,000 in loans. An appropriate Order is being entered.