United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 19, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT
_____

No. 05-10038
_____

In The Matter Of:  MIRANT CORPORATION; ET AL.,

                                          Debtors.


MIRANT CORPORATION; MLW DEVELOPMENT LLC;
MIRANT AMERICAS ENERGY MARKETING LP; MIRANT
AMERICAS GENERATION LLC; MIRANT MID-ATLANTIC
LLC; ET AL.,

                                          Appellants,


                    versus


POTOMAC ELECTRIC POWER COMPANY; FEDERAL
ENERGY REGULATORY COMMISSION,

                                          Appellees.


_____

No. 05-10419
_____

In The Matter Of:  MIRANT CORP.,

                                          Debtor.

POTOMAC ELECTRIC POWER CO.,

                                          Appellee,


                    versus


MIRANT CORP.; MLW DEVELOPMENT LLC; MIRANT
AMERICAS ENERGY MARKETING LP; MIRANT
AMERICAS GENERATION LLC; MIRANT MID-ATLANTIC
LLC; ET AL.,

                                          Appellants.
_____


Appeals from the United States District Court

_____

Before JOLLY, SMITH, and GARZA, Circuit Judges.

PER CURIAM:[1]

This appeal arises from the Asset Purchase and Sale Agreement (APSA) entered into between Mirant Corporation (Mirant) and Potomac Electric Power Company (PEPCO). This appeal is not the first time these parties have been before us, see In re Mirant Corp., 378 F.3d 511 (5th Cir. 2004), and we recognize that it may not be the last. After argument and review of the lengthy briefing and extensive record in this case it is evident that a single theme lies behind the thousands of pages generated in this litigation: Mirant's unrelenting and unjustified effort to avoid a legitimate contractual obligation it now views as a bad deal.

In order to secure PEPCO's acceptance of Mirant's bid to purchase certain electric generating facilities, Mirant agreed to receive assignment of PEPCO's Purchase Power Agreements (PPAs).[2] At the time of negotiations both Mirant and PEPCO acknowledged that the purchase price for electricity under the PPAs was above market price, resulting in an agreed "negative value" of approximately

_____

[1] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] At oral argument Mirant's counsel conceded that "but for" the Back-to-Back agreement and the assignment of PEPCO's PPAs to Mirant, PEPCO would not have agreed to the total deal entered between the parties in the APSA.

$500 million.  Consequently, the parties reduced the agreed sale price by $500 million, representing the loss on the PPAs.  Instead of $3.2 billion, Mirant paid Pepco $2.65 billion.  The parties memorialized their agreement in the APSA, which included 1) the transfer of certain power generation facilities to Mirant; 2) the assignment of PEPCO's PPAs to Mirant, including the Back-to-Back arrangement agreed to as a contingency plan in the event that the PPAs were not assignable to Mirant; 3) lease agreements and easements allowing Mirant access to the generating facilities; and 6) inter-connection agreements allowing Mirant to transfer power along PEPCO's inter-connection network.

PEPCO notified Mirant at the December 19, 2000 closing on the APSA that certain PPAs were unassignable,[3] and the parties began performing under the APSA's contingency plan known to the parties as the Back-to-Back Agreement (BTB).  The cost to Mirant under the BTB is approximately $10-15 million per month.

In July 2003, Mirant filed for bankruptcy and immediately filed a motion to reject the BTB (first motion to reject), but did not attempt to reject the remaining executory portions of the APSA.  PEPCO, because of the automatic stay, was required to continue

---

[3] PEPCO was unable to secure the permission of certain power suppliers to assign their PPA agreements to Mirant.  Thus five PPAs were ultimately unassigned. Consequently, per the terms of Section 2.4 of the APSA, PEPCO gave notice in writing to Mirant that it was activating the Back-to-Back Agreement as to those unassignable PPAs.  PEPCO delivered this written notice to Mirant at the closing on the APSA.

performance. On December 9, 2004, the district court denied Mirant's first motion to reject, finding that the BTB was not severable from the APSA and thus was not eligible for rejection under 11 U.S.C. § 365. Mirant appeals that order (appeal no. 05-10038). In appeal number 05-10038, Mirant raises two points of error: 1) the finding of the district court that the BTB was not severable from the APSA; and 2) the standard for rejection articulated in dicta by the district court.

On the very date the district court denied Mirant's first motion to reject, Mirant unilaterally declared that it would no longer perform its obligations under the BTB and ultimately filed a second motion to reject with the bankruptcy court.[4] This second motion and related pleadings were withdrawn from the bankruptcy court by the district court. On March 1 and March 16, 2005, the district court ordered Mirant to perform under the BTB until either 1) rejection was approved, or 2) Mirant demonstrated that discontinuing performance pending rejection was within the public interest. (The second motion to reject is still pending before the district court.) Mirant appeals these March orders (appeal no. 05-10419) and seeks a stay of the order to perform under the BTB pending ruling on the merits of its second motion to reject. In

---

[4] On January 19, 2003, the bankruptcy court issued an order requiring Mirant to resume performance under the BTB unless and until one of three contingencies occurred. One of these contingencies was that Mirant file "a motion to reject the APSA." Consequently, instead of resuming payment, on January 21, 2003, Mirant filed its second motion to reject.

4

appeal number 05-10419, Mirant raises an additional two points of error: 1) the district court's withdrawal from the bankruptcy court of Mirant's second motion to reject and related pleadings; and 2) the district court's order that Mirant perform under the BTB until rejection of the BTB or APSA is approved on the merits.

In section I we address the issues presented in appeal number 05-10038. Section II addresses the issues involved in appeal number 05-10419. For the reasons set forth below we AFFIRM all orders of the district court.

I

Appeal no. 05-10038 challenges the district court's December 9, 2004 order denying Mirant's first motion to reject the BTB portion of the APSA. Section 365(a) of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."[5] 11 U.S.C. § 365(a). Under § 365, "[i]t is well established that as a general proposition an executory contract must be assumed or rejected in its entirety." Stewart Title Guaranty Co. v. Old Republic Nat'l Title Ins. Co., 83 F.3d 735, 741 (5th Cir. 1996) (citation omitted). This "often-repeated statement . . . means only that the debtor cannot choose to accept the

---

[5] Through legal fiction, the rejected contract is considered to be breached by the debtor and the non-breaching party to the contract is then given an unsecured claim in the bankruptcy estate equal to the amount of the damages resulting from the breach. See In re Mirant, 378 F.3d at 519-20.

5

benefits of the contract and reject its burdens to the detriment of the other party to the agreement." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985). Consequently, to reject a contract under § 365, a debtor must establish that 1) the contract is executory, and 2) the contract is either an entire agreement, or a severable portion of an agreement. Once a contract is deemed eligible for rejection, court approval is required for rejection.[6] See 3 Collier on Bankruptcy ¶ 365.03 (15th Ed. Rev. 2004) ("The decision to assume or reject a contract or lease is subject to court approval.").

---

[6] Under Section 10.1(b)(iii), the APSA provides that in the event Mirant breaches the BTB agreement PEPCO gets a claim for damages rather than a release of its APSA obligations. Mirant thus argues that this provision indicates severability, and that if Mirant is allowed to reject the contract PEPCO will receive the remedy it bargained for -- a claim for damages. Although at first glance this argument may appear to have merit, the contention ultimately fails. The standard for § 365 rejection is not whether the non-breaching party will be made whole; nor does the inquiry examine whether the non-breaching party will ultimately receive the negotiated remedy. Instead, § 365 requires a two-part consideration -- 1) whether there is an executory contract; and 2) whether the debtor seeks to reject a severable agreement. Consequently, PEPCO's contractual remedy for breach of the BTB is, at this stage in the analysis, irrelevant.

Additionally, Mirant's Section 10.1(b) argument was first presented at oral argument, relying on certain APSA excerpts provided to the panel at argument in a group of documents entitled the "Argument Submission." This "Argument Submission" is not a part of the record or briefing in this case, nor does it contain any citation indicating that its content is a part of the record on appeal.

The parties agree that the relevant portions of the APSA are executory.[7]   Thus, our analysis of the December 9, 2004 order begins with the question of severability.  Once severability is resolved, we consider the appropriate standard for approving rejection.  Thus we turn to examine, first whether the BTB agreement is severable from the APSA, and second, the appropriate standard for rejection in this context.

A

The issue of severability under § 365 requires that an executory contract be rejected in toto to prevent a debtor from picking through an agreement, accepting the benefits while sloughing the burdens.  See In re Café Partners/Washington 1983, 90 B.R. 1, 5 (Bankr. D.D.C. 1988) ("the Debtor may not pick and choose from among the desirable and undesirable portions of the contract").  However, "[i]f a single contract contains separate, severable agreements the debtor may reject one agreement and not another."  Stewart Title Guaranty Co., 83 F.3d at 741.

The district court found, and the parties agree, that severability for purposes of § 365 rejection is determined by applying the non-bankruptcy, general legal rules applicable to the agreement at issue.  See, e.g., In re Café Partners, 90 B.R. at 6 ("[W]hether a contract . . . is an entire contract is not a

_____

[7] Although the Code does not define "executory contract," the legislative history indicates the term refers to a contract "on which performance is due to some extent on both sides."  In re Mirant, 378 F.3d at 518.

7

question of the Federal bankruptcy law but of the law, usually State law, that would govern the parties' rights outside bankruptcy.").

The APSA itself provides that it is to be "governed by and construed in accordance with the law of the District of Columbia." APSA, § 12.6.  Under D.C. law, the well established test of severability is whether the parties, at the time the agreement was entered, intended the contract to be severable.  See, e.g., Holiday Homes v. Briley, 122 A.2d 229, 232 (D.C. 1956) ("Whether a number of promises constitutes one contract or more than one is primarily a question of intention of the parties.").  Howard University v. Durham, 408 A.2d 1216, 1219 (D.C. 1979), observed that while the intention of the parties controls, "[t]here is no set answer to the question of when a contract is divisible."  However, the court found there were several "factors to be considered" in determining whether the parties intended the contract to be severable.  Id. Those factors as enumerated are:

> 1) whether the parties assented to all the promises as a single whole; 2) whether there was a single consideration covering various parts of the agreement or whether consideration was given for each part of the agreement; and 3) whether [the] performance of each party is divided into two or more parts, the number of parts due from each party being the agreed exchange for a corresponding part by the other party.

Id.; see also Cahn v. Antioch Univ., 482 A.2d 1216, 1219 (D.C. 1994) (affirming the Howard Univ. factors).  Based on these

8

factors, the district court concluded that the BTB was not severable from the APSA and thus was not eligible for rejection. After considering these factors and the corresponding evidence, we agree.[8]

First, the parties clearly "assented to all the promises" -- the sale of the generation facilities, the lease agreements, the easements, the BTB agreement, and the inter-connection agreements -- "as a single whole." The parties did not enter separate contracts or transactions; nor were the various agreements executed

---

[8] The APSA itself contains a clause entitled "Severability" which reads as follows:

> Section 12.11 <u>Severability</u>. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Mirant argues that this clause indicates the parties' intent that the agreement be severable. It contends that the language of the APSA clearly reveals that the APSA and the BTB were intended to be two separate agreements. We disagree. This clause only serves to prevent the termination of the entire agreement should something outside the control of the parties -- invalidity, illegality, or impossibility -- occur with respect only to a part thereof. It does not provide insight into the parties' view of the interconnection of the various portions of the APSA.

or closed at separate times.  Instead, each part of this agreement was contained in a five-volume document collectively entitled the Asset Purchase and Sale Agreement.  This agreement was executed on June 7, 2000 as one package, and the parties held the closing on December 19, 2000.[9]  As further evidence that the parties viewed this deal "as a single whole," Section 12.10 of the APSA identifies the different parts of the agreement and states that <u>collectively</u> they "embody the entire agreement and understanding of the Parties."[10]

---

[9] Mirant confuses the issue of execution by arguing that the BTB agreement is a "separately executed letter agreement."  Mirant contends that the December 19, 2000 letters from PEPCO to Mirant constitute the "executing documents" for the BTB agreement.  This argument is misleading and without merit.  Schedule 2.4 of the APSA contains the BTB agreement, with section II.D of Schedule 2.4 outlining how the BTB agreement will be administered.  Section II.D specifically provides that the BTB agreement is "[e]ffective as of the [c]losing [d]ate" as to all unassignable PPAs, and that PEPCO was to provide to Mirant "all information which [PEPCO] now has or hereafter acquires or to which [Mirant] is entitled with respect to each Unassigned PPA."  Consequently, on the date of the closing of the APSA, December 19, 2000, PEPCO provided to Mirant letters that identified the unassignable PPAs  and notified Mirant that the identified PPAs would be "governed by Section II of Schedule 2.4 of the Asset Sale Agreement."  This letter indicates in no way a separate execution, or a separate agreement.  Instead, the letters only provide "information" required by section II.D, i.e., the identity of the unassigned PPAs, on the "effective date" of the Schedule 2.4 agreement, the December 19 closing.

[10] Section 12.10 states as follows:

> SECTION 12.10 <u>Entire Agreement</u>.  This Agreement, the Confidentiality Agreement and the Ancillary Agreements including the Exhibits, Schedules, documents, certificates and instruments referred to herein or therein and other contracts, agreements and instruments  contemplated hereby or thereby,

10

Second, it is clear that the parties negotiated one single consideration for the entirety of the deal, including the BTB agreement. Mirant's arguments that consideration for the APSA was separate or distinct from that of the BTB agreement are, at best, misguided.[11] Further, Mirant's focus on the exchange of money as

> embody the entire agreement and understanding of the Parties in respect of the transactions contemplated by this Agreement. There are no restrictions, promises, representations, warranties, covenants or undertakings other than those expressly set forth or referred to herein or therein. This Agreement and the Ancillary Agreements supersede all prior agreements and understandings between the Parties with respect to the transactions contemplated by this Agreement other than the Confidentiality Agreement.

Mirant's argument that this is merely a standard integration clause having no bearing on severability is without merit. Clearly, this section reflects an "integration clause." However, the language of the section also indicates that the parties viewed this transaction as containing a series of supporting documents, embodied in one unified agreement.

[11] Mirant makes three arguments to support its contention that the APSA and BTB were supported by separate consideration. Each mischaracterizes the agreement between these parties and is thus without merit. First, Mirant argues that consideration under the APSA was the $2.65 billion which was distinct and unrelated to the monthly payments made under the BTB agreement. This argument is inconsistent with the fact that the $2.65 billion purchase price included reduction of $500 million to reflect the negative value of the PPAs -- a fact conceded by Mirant at oral argument.

Second, Mirant argues that there are different methods or periods of payment -- lump sum for the APSA, and monthly payments for the BTB agreement. This argument ignores the fact that, as discussed below, the monthly payments <u>are</u> <u>not</u> the consideration for the BTB agreement.

Finally, Mirant argues that the duration of payment is different -- one single transfer under the APSA versus the ongoing

11

the only evidence of consideration is misplaced.  Consideration is a bargained-for promise or performance.  <u>See</u> Restatement (Second) of Contracts § 71 (1979).  The consideration for the BTB agreement is not, as Mirant suggests, the monthly payments made by Mirant to PEPCO.  Nor was the consideration for the power generating facilities the $2.65 billion dollars paid by Mirant.  Instead, as stated by Mirant's counsel at oral argument, "the consideration the parties negotiated for was a whole deal."  That is to say, there was one amount as consideration for this overall agreement; that single amount reflected the negotiated value of the entire transaction -- PEPCO agreed to sell its generating facilities and lease its properties and inter-connective capabilities, and grant certain easements; Mirant agreed to pay $2.65 billion and take on the PPAs.[12]

The third and final <u>Howard University</u> factor asks whether the performance required by the alleged separate agreement can be divided from the performance required by the remainder of the agreement.  Performance is divisible where the alleged severable

_____

payment by Mirant to PEPCO under the BTB agreement.  Mirant would have the court view the APSA as a single transaction completed on December 19, 2000.  However, there are many ongoing rights and obligations under the APSA, other than the BTB agreement, i.e., the lease and easement agreements and the inter-connection agreements.

[12] Common sense suggests this view of the consideration supporting the parties' agreement.  Why would Mirant enter a legal obligation requiring it to pay an above-market rate for power, unless Mirant was taking on that obligation in exchange for something Mirant deemed to be valuable -- in this case the generation facilities and associated agreements?

12

obligations "can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents."[13]  Restatement of Contracts (Second) § 183; see also Howard Univ., 408 A.2d at 1219 ("whether performance of each party is divided into two or more parts, the number of parts due from each party being the agreed exchange for a corresponding part by the other party").  PEPCO's obligations under the BTB agreement[14] were not the "agreed equivalent" of the "agreed exchange" for Mirant's monthly payment obligations under the BTB agreement.  Instead, Mirant's payment of $2.65 billion and assumption of the PPAs along with the BTB, was the agreed exchange and negotiated equivalent of PEPCO's transfer of its generating facilities, lease and easement agreements, and inter-connection agreements.  Because the parties' respective obligations under the BTB are not the "agreed exchange" for the other party's performance under the BTB, performance of the BTB is not divisible from performance of the APSA.

---

[13] This principle can be explained thusly: A contract between two parties, 1 & 2, has three parts, A, B, and C.  Performance of part A is divisible only where Party 1's performance under part A is the "negotiated exchange" or "agreed equivalent" for Party 2's performance under part A.  In other words the performance of each party under the subject portion of the contract constitutes equal and matching equivalents, without reference to or performance under the remainder of the contract.

[14] Under the BTB each month PEPCO continues performing under the unassignable PPAs, purchasing power from the third party, selling that power in the market, and then billing Mirant for PEPCO's loss on the sale.

Each of the Howard University factors points in this case to one single and indivisible agreement: there was assent by the parties "to all the promises as a single whole"; there was "a single consideration covering [the] various parts of the agreement"; and the performance is not divisible. Howard Univ., 408 A.2d at 1219. Nothing in the record or arguments gives any indication to the contrary; nor is there any evidence that the parties intended any part of the agreement to be severable from the whole. The record is clear that, as the district court found, "the furthest thing from the minds of the parties when they entered into the APSA, and agreed to a contract price of $2.65 billion, was that . . . the Back-to-Back Agreement would be treated as contractual commitment[] separate from and independent of [the] sale . . . of [Pepco's] electric generation facilities."[15]

---

[15] In their briefing and at argument, the parties spent extensive time discussing Stewart Title Guaranty Co. v. Old Republic National Title Insurance Co., 83 F.3d 735 (5th Cir. 1996), and the validity of the "but for" or "essential" test. Both parties agree, however, that the law of the District of Columbia applies, and that the ultimate question under that law is the intent of the parties at the time the contract was executed. Further, both parties contend that the Howard University factors should be considered in determining the parties' intent. As demonstrated by the above discussion, the Howard University factors indicate the parties did not intend the BTB to be a severable part of the APSA. Mirant conceded at oral argument that the BTB is not severable under the "essential" or "but for" test. (Specifically counsel for Mirant stated, "If the but for test applies we lose.") Thus, under either the "essential" test or Howard University approach the outcome in this case is the same -- no severability. Consequently, it is unnecessary for us to determine whether the "essential" or "but for" test, or the Howard University approach applies.

14

As the parties to this agreement did not intend it to be severable from the agreement as a whole, we hold that the BTB agreement is not separate or severable from the remaining portions of the APSA. Consequently, the district court was correct to refuse Mirant's motion to reject its obligations under the BTB agreement under § 365 of the Bankruptcy Code.

B

As we have determined that the BTB agreement is not severable and thus not eligible for § 365 rejection, determination of the applicable standard a debtor must meet for rejection is unnecessary. Nevertheless, we should recognize that the purpose of § 365 rejection is to free the debtor from agreements that would hinder or disable reorganization. See, e.g., National Labor Relations Board v. Bildisco & Bildisco, 104 S.Ct. 1188, 1197 (1984) ("The fundamental purpose of reorganization is to prevent a debtor from going into liquidation . . . . Thus, the authority to reject an executory contract is vital to the basic purpose of a Chapter 11 reorganization, because rejection can release the debtor's estate from burdensome obligations that can impede a successful reorganization."); In re Nat'l Gypsum Co., 208 F.3d 498, 504 (5th Cir. 2000) (holding that the purpose of § 365 is to "release the debtor's estate from burdensome obligations that can impede successful reorganization"); Richmond Leasing Co., 762 F.2d at 1310 ("[§ 365] . . . serves the purpose of making the debtor's rehabilitation more likely"). Mirant is currently operating under

15

a plan of reorganization approved on December 9, 2005, which provides for continuing performance under the BTB agreement <u>and</u> for payment to all its pre-petition creditors in full. Consequently it does not appear on the record before us that performance of the BTB obligations is causing any hindrance to Mirant's successful reorganization.

Having determined that the district court's order denying Mirant's first motion to reject was not error, we turn now to review the March 1 and March 16, 2005 district court orders requiring Mirant to perform its obligations under the BTB agreement pending resolution of its second motion to reject.

## II

In appeal number 05-10419, Mirant raises two points of error: first, the district court's withdrawal from the bankruptcy court of Mirant's second motion to reject and related pleadings to allow the district court to decide these motions; and second, the district court's order requiring Mirant to perform its obligations under the BTB agreement pending court approval of Mirant's requested rejection under § 365. Each issue will be considered in turn:

## A

Mirant classifies the district court's withdrawal of the second motion to reject and related proceedings from the bankruptcy court as a "complete disruption of the court system." Mirant contends that the district court erred in withdrawing these pleadings from the bankruptcy court. Matters under Chapter 11 are

within the district court's original jurisdiction, and reference to and withdrawal from the bankruptcy court of bankruptcy matters is left to the discretion of the district court. 28 U.S.C. § 157(a) (2005). Thus, as PEPCO correctly notes, an order withdrawing referral of a matter from bankruptcy court <u>is</u> <u>not</u> a final appealable order, and thus, this court has no appellate jurisdiction to review an appeal from such an order. <u>See</u> <u>In re Matter of Lieb</u>, 915 F.2d 180, 183 (5th Cir. 1990) (finding no appellate jurisdiction to review a district court's determination regarding withdrawal as the order was "neither final nor collateral"); <u>see</u> <u>also</u> <u>Caldwell-Baker Co. v. Parsons</u>, 392 F.3d 886 (7th Cir. 2004) (citing cases from the First, Second, Third, Fifth, Seventh, Ninth, Tenth and Eleventh Circuits, finding that <u>no</u> <u>circuit</u> considering the issue has found appellate jurisdiction to review a grant or denial of withdrawal).[16]

---

[16] 28 U.S.C. § 157(d) provides for both mandatory and permissive withdrawal by the district court. The district court in its March 1, 2005 order found both applicable.

First, under 28 U.S.C. § 157(d), mandatory withdrawal is required where "the [district] court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d) (2005). Here, resolution of the parties' dispute required consideration of both Title 11 and the federal regulation of electricity. This Court's instruction in <u>Mirant I</u> provided that FERC be involved in determining whether rejection of the BTB is appropriate, as well as the acknowledgment that resolution of rejection will necessarily impact on a federally regulated electricity contract. <u>See</u> <u>In re Mirant</u>, 378 F.3d at 520, 524.

Second, § 157(d) allows for permissive withdrawal "for cause

17

In its final point of error in this second appeal, Mirant raises questions relating to the portions of the March 1 and March 16, 2005 orders requiring it to perform its obligations under the BTB agreement during the pendency of its second motion to reject. Mirant argues that unless and until an executory contract is assumed or rejected, Mirant has no legal obligation to perform under that contract. Thus, Mirant contends that the district court erred in requiring it to perform under the BTB pending rejection.[17] Mirant's position is contrary to "the universally accepted rule that a trustee [or debtor] cannot accept the benefits of an executory contract without accepting the burdens as well."

---

shown." The district court made several findings as to why permissive withdrawal was appropriate. These findings included: the litigious and seemingly inconsistent positions of Mirant; judicial economy; the district court's familiarity with the issues; and the seemingly inconsistent rulings of the bankruptcy court. See Holland America Ins. Co. v. Succession of Roy, 777 F.2d 992, 998 (5th Cir. 1985) ("The district court should consider the goals of promoting uniformity in bankruptcy administration, reducing forum shopping and confusion, fostering the economical use of the debtors' and creditors' resources, and expediting the bankruptcy process."). On the briefing before us, the arguments made by Mirant that the district court erred in withdrawing the second motion for rejection and related pleadings appear frivolous. Such baseless arguments do not enhance Mirant's credibility before this Court.

[17] Mirant also raises various contentions that the March orders constitute injunctions that are procedurally deficient, ultimately resulting in a violation of Mirant's due process rights. These arguments are without merit. As noted below, Mirant had been ordered at least four times to pay under the BTB. Had Mirant complied with these previous orders the district court would not have had to issue the March orders once again commanding Mirant's performance under the BTB agreement pending rejection.

<u>Schokbeton Indus., Inc. v. Schokbeton Prods. Corp.</u>, 466 F.2d 171, 175 (5th Cir. 1972); <u>see</u> <u>also</u> <u>Bildisco</u>, 104 S.Ct. at 1199 ("If the debtor . . . continue[s] to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract . . . the debtor . . . is obligated to pay.") (internal citations omitted).[18]

Mirant argues that it has received no post-petition benefit from the BTB agreement and thus does not fall under this generally accepted principle. This contention has no basis. Mirant has made no attempts or offers to compensate PEPCO for the $500 million discount Mirant received on the sale price of the generating facilities; it continues to distribute electricity along PEPCO's lines using the inter-connection agreements; it continues to operate plants on land owned by PEPCO per the lease agreements; it continues to access certain generating and transfer facilities per the easement agreements; and so on. Each day of operation Mirant benefits from the rights and privileges it obtained <u>in</u> <u>exchange</u> <u>for</u> the obligations associated with the assignment of the over-market PPAs and the requirements of the BTB agreement. Mirant will

---

[18] There can be disputes as to the amount the debtor must pay as the "reasonable value" of the post-petition benefit bestowed by the non-debtor. <u>See</u>, <u>e.g.</u>, <u>Bildisco</u>, 104 S.Ct. at 1199 (holding that the debtor is required to pay the "reasonable value" for post-petition benefit, "which, depending on the circumstances of a particular contract, may be what is specified in the contract"). However, Mirant argues only that it should not have to pay at all. Mirant has not disputed the amount it was ordered to pay pending rejection, and consequently that issue is not before us.

continue to receive these benefits as PEPCO is required by the automatic stay to perform under all these on-going portions of the APSA, unless and until rejection is approved. Despite Mirant's cites to general bankruptcy principles, there is no authority to support the position that Mirant may force PEPCO to continue performance under the BTB while Mirant discontinues and refuses payment without court permission, indeed in defiance of court order.

By the time the district court issued the March orders, Mirant had been directly or indirectly ordered to perform under the BTB at least four times.[19] Further, to the extent Mirant argues that its second motion to reject cured any problems with its prior non-performance this argument is wholly without merit.[20] Thus, the

---

[19] See Bankruptcy Order, Sept. 25, 2003 ("The debtors shall continue to perform under . . . the [BTB agreement] . . . until specifically relieved of such obligation by order of this Court or such other court of competent jurisdiction."); Bankruptcy Order, Sept. 29, 2003 ("Debtors may not discontinue these agreements without an order of the bankruptcy court entered only after notice and hearing."); District Court Order, January 4, 2004 (stating that any action causing PEPCO to be denied payment under the BTB would be appropriate only after a specific showing by Mirant to the court); District Court Order, December 9, 2004 (rejecting Mirant's First Motion to Reject the BTB).

[20] Specifically, Mirant's claim that it is seeking to reject the entire APSA in response to the January 19, 2003 order of the district court appears disingenuous. As the district court noted in its March 1 order, Mirant's second motion "again seeks judicial approval [to] reject[] . . . the BTB." The second motion purports to reject "the entirety of the APSA." However, the motion goes on to state that the "Interconnection Agreement," "Easement, License and Attachment Agreements," "Local Area Support Agreement," and "Site Lease Agreements" are separate from the APSA and thus would not be included in the rejection. The only remaining portions of

20

district court did not err in ordering Mirant to perform under the BTB pending rejection approval.

III

For the reasons stated herein, we hold that the BTB agreement is not severable from the APSA and is thus not eligible for rejection under 11 U.S.C. § 365.  Further, we hold that the order of the district court withdrawing Mirant's second motion to reject and related pleadings from the district court is not a final appealable order.  Consequently, we have no appellate jurisdiction to review the withdrawal.  Additionally, we find that the district court did not err in ordering Mirant's performance under the BTB agreement pending resolution of the second motion to reject.  For these reasons, the district court order of December 9, 2004

---

the APSA are the transfer of PEPCO's generating facilities and the BTB agreement.  The transfer of the generating facilities has been completely performed and is thus no longer executory. Consequently, despite the "clever" labeling of its motion, Mirant is essentially seeking to reject the BTB.

This type of legerdemain is not uncommon in the litigious history of this case.  Mirant's attempts to avoid its BTB obligations have not been limited to motions to reject. As pointed out by FERC in its January 19, 2006 order, Mirant's initial proposed plan of reorganization called for the creation of a new entity -- "New Mirant."  The plan then allowed Mirant to transfer all its remaining assets, including the generating facilities, leases, easements, and inter-connection agreements under the APSA to New Mirant while leaving performance of "its APSA obligations [previously described in the FERC order as the obligations under the BTB agreement] with the remaining corporation -- "Old Mirant." The result would be that a judgment-proof entity retained the BTB obligations while the New Mirant enjoyed the benefits of the APSA.

21

involved in appeal no. 05-10038, and the March 1, and March 16, 2005 orders involved in appeal 05-10419 are affirmed.

Mirant is cautioned that, while we welcome legitimate appeals, any future appeals that continue the pattern of attempts to reject the BTB agreement or efforts to refuse payment pending rejection may well invite the most severe sanctions available to this court.

AFFIRMED; SANCTIONS WARNING ISSUED.